UNITED STATES of America, Plaintiff, and Interstate Sanitation Commission, Intervenor Plaintiff,

v.

CITY OF HOBOKEN, et al., Defendants.

UNITED STATES of America, Plaintiff, and Interstate Sanitation Commission, Intervenor Plaintiff,

v.

TOWNSHIP OF NORTH BERGEN, et al., Defendants.

UNITED STATES of America, Plaintiff, and Interstate Sanitation Commission, Intervenor Plaintiff,

v.

CITY OF BAYONNE, et al., Defendants.

Civ. A. No. 79–2030.

United States District Court, D. New Jersey.

Nov. 23, 1987.

Ralph J. Marra, Jr., Asst. U.S. Atty., Newark, N.J., Lynn Wright, Coles H. Phinizy, Jr., Office of Regional Counsel, Region II, U.S. E.P.A., New York City, for plaintiff U.S. E.P.A.

Claire Biunno, New York City, for intervenor plaintiff Interstate Sanitation Com'n.

Richard Heubel, Krieger, Ferrara, Flynn & Catalina, Jersey City, N.J., for defendant Town of West New York.

Robert M. Meyerovic, Heubel & Meyerovic, North Bergen, N.J., for defendant West New York Mun. Utilities Authority.

Herbert B. Bennett, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J. for defendant City of Bayonne.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This is a consolidated civil action comprised of 3 separate lawsuits. The action is brought by the United States, and by the Interstate Sanitation Commission (the "ISC") as plaintiff-intervenor, against a number of municipalities located in Hudson County, New Jersey, certain municipal sewerage authorities, the Hudson County Utilities Authority (the "HCUA"), and the State of New Jersey, alleging violations of the federal Clear Water Act, 33 U.S.C. §§ 1251 et seq. ("the Act"), also known as the Federal Water Pollution Control Act. The violations allegedly resulted from the discharge of untreated or undertreated sewage and wastewater into the waters surrounding Hudson County on 3 sides, including the Hudson River, Newark Bay, and the Kill Van Kull, a tidal waterway separating Bayonne, New Jersey from Staten Island, New York, and connecting Newark Bay and New York Harbor.

Before me are motions for partial summary judgment on the issue of liability, brought by plaintiffs against the Hudson County defendants. Specifically, plaintiff United States moves against defendants Hoboken, Jersey City, the Jersey City Municipal Sewerage Authority, West New York, the West New York Municipal Utilities Authority, Bayonne, North Bergen, and the North Bergen Municipal Utilities Authority, seeking a finding that these defendants are liable under the Act for exceeding effluent discharge limitations imposed upon them by the federal Environmental Protection Agency (the "EPA"), and the New Jersey Department of Environmental Protection ("DEP") acting under federal authority, in the form of National Pollutant Discharge Elimination System ("NPDES") permits. Plaintiff ISC moves against the aforementioned defendants and also defendants Union City, Weehawken, and the HCUA, seeking a finding that these defendants are liable under the Act and under the Tri-State Compact for Pollution Abatement entered into by New Jersey, New York and Connecticut for failure to abide by ISC Water Quality Regulations. Neither plaintiff has at this time moved for any ruling in regard to the civil penalties and injunctions which they seek as relief from defendants' alleged violations.

At this time, I address these motions in regard to only some for which defendants have moved against. Upon request of the moving parties and the relevant defendants, I adjourned the motions against Jersey City and its Sewerage Authority until November 23, 1987, and, initially, adjourned the motions against Hoboken, Union City, Weehawken, and the HCUA until October 26, 1987. Prior to October 26, a further adjournment of the October 26 motions was requested, and I adjourned them until November 23, 1987. North Bergen and its utilities authority have reported that they do not contest the motions brought against them by both plaintiffs, and Bayonne reports that it does not contest the motion brought against it by the ISC. Under my instruction, plaintiffs have submitted to me the appropriate forms of

order granting the unopposed summary judgment, and I have signed the orders.

Aside from this, opposition is being asserted today by Bayonne on the motion brought against it by the United States, and by West New York and the West New York Municipal Utilities Authority on the motions brought against them by the United States and the ISC. I shall deal first with Bayonne.

■ According to Rule 56, summary judgment may only be granted if, drawing all inferences in favor of the nonmoving party, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. *Celotex*, 106 S.Ct. at 2553. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) (emphasis in *Matsushita*)).

Before turning to the issues in dispute on this motion, I shall relate the underlying issues of law and fact upon which the parties appear to agree.

The Clean Water Act was passed in 1972 to "restore and maintain the chemical, physical and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). To meet this goal, the Act required, *inter alia*, that persons discharging effluents from point sources into navigable waters abide by certain effluent limitations. The limitations were designed to be attainable by persons who made use of pollution-control technologies. *See* S.Rep. No. 414, 92nd Cong., 1st Sess. 42 (1971), *reprinted in* 1972 U.S.Code Cong. & Admin.News 3668; *see also E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 126–129, 97 S.Ct. 965, 974–76, 51 L.Ed.2d 204 (1977); *EPA v. Cal. ex rel. State Water Resources Control Board*, 426 U.S. 200, 204–5, 96 S.Ct. 2022, 2024–25, 48 L.Ed.2d 578 (1976).

Effluent limitations are imposed upon individual dischargers through the issuance of NPDES permits by the EPA or a designated state agency. No discharges are allowed without a permit; with a permit, a discharger may discharge only up to the levels of effluent limitation set out in the permit, and must engage in self-monitoring practices and file discharge monitoring reports ("DMR's") in order to aid the EPA and state agencies in enforcing the permit limitations. *See* 33 U.S.C. §§ 1311(a), 1311(b), 1318(a), 1342.

■ Enforcement of NPDES permit limitations may be had in part by the prosecution of federal civil actions for monetary penalties and injunctive relief. *See* 33 U.S.C. § 1319(a)(3), 1319(b), and 1319(d); *see also EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. at 205, 96 S.Ct. at 2025. In an enforcement action, a defendant's DMR's constitute admissions regarding the levels of effluent that the defendant has discharged. If the DMR's show that the defendant has exceeded its NPDES permit limitations, then permit violations are established. *See, e.g., Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1491–93 (9th Cir.1987); *Student Public Interest Research Group v. Fritzsche, Dodge & Olcott*, 579 F.Supp. 1528, 1538 (D.N.J.1984), *aff'd on other grounds*, 759 F.2d 1131 (3d Cir.1985); *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 451–52 (D.Md.1985); *Student Public Interest Research Group v. Monsanto Co.*, 600 F.Supp. 1479, 1485 (D.N.J. 1985); *United States v. Velsicol Chemical Corp.*, 438 F.Supp. 945, 948 (W.D.Tenn. 1976). In general, to exceed a permit constitutes a violation of the Act. *See EPA v. California ex rel. State Water Resources*

*Control Bd.,* 426 U.S. at 205, 96 S.Ct. at 2025; *Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1374–77 (D.C.Cir.1977); *Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 611 F.Supp. 1542, 1545 (E.D.Va.1985), *aff'd,* 791 F.2d 304 (4th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 872, 93 L.Ed.2d 827 (1987).

Defendant Bayonne owns and operates a "Publicly Owned Sewage Treatment Works," in "POTW," as that term is defined by EPA regulations. *See* 40 C.F.R. § 122.2. The Bayonne POTW collects and treats wastewater and sewage from residential, commercial, and industrial sources located in Bayonne. The Bayonne POTW discharges it effluent into the Kill Van Kull. Bayonne received its first NPDES permit in 1978. The permit was to run from December 31, 1978 to December 31, 1983. That permit limited, among other things, the acceptable level of biochemical oxygen demand ("BOD 5") exerted by Bayonne's effluent, and the acceptable concentration of total suspended solids ("TSS") in Bayonne's effluent. A BOD 5 measurement indicates the quantity of oxygen an effluent drains from the water during 5 days of decomposition. A TSS measurement, although described in more genteel terms by the parties, apparently indicates the quantity of solid sewage present in the water.

The effluent limitations set out in Section B.I.A of Bayonne's permit were premised in part on the use of "secondary treatment" pollution-control technology at the Bayonne POTW. Sewage and wastewater receive "primary treatment" when physical processes are used to screen out solids; they receive "secondary treatment" when, in addition to physical processes, biological processes are used to break down some of the remaining impurities. Separate provisions of the Act call for all POTW's such as Bayonne's to meet effluent limitations based on the use of secondary-treatment technology no later than July 1, 1977, 33 U.S.C. § 1311(b), and establish federal-finding programs for the implementation of secondary-treatment technology at POTW's

by the 1977 deadline, 33 U.S.C. §§ 1281 *et seq.*

Bayonne has never had secondary treatment technology in place at its POTW. Rather, it relies solely on less-effective primary-treatment efforts to clean its effluent. Nor did Bayonne meet the 1977 deadline for effluent limitations set out in the Act. This failure is not a basis for liability in and of itself, however, because Bayonne was to some degree released from the 1977 deadline. In 1977, cognizant of delays in secondary-treatment implementation caused by failures of finding and public leadership at the local, state, and federal levels, Congress amended the Act to allow for extensions of the 1977 effluent-limitation deadline to July 1, 1983 for certain deserving PTW's identified by the EPA. 33 U.S.C. § 1311(i). In accordance with this provision, the EPA included a special section in Bayonne's 1978 permit, for some period of time during the term of the permit, from the secondary-treatment effluent standards which would otherwise become enforceable after the 1977 deadline. This section of the permit imposed instead "interim" effluent limitations that were not premised on the use of secondary-treatment technology. Whether that section, designated C.II in the permit, granted Bayonne its interim limitations for a definite, short period of time or for a longer, potentially open-ended period of time is the issue chiefly in dispute on this motion. In any event, the 1978 permit continued in effect until March 1986, when the N.J. DEP, acting as a designated permit-issuing authority in accordance with the Act, belatedly issued Bayonne a new permit running until 1991.

In support of its motion against Bayonne, the United States has submitted a wealth of factual material, including copies of Bayonne's duly-filed DMR's. This material, including the DMR's, establishes that Bayonne violated its effluent limitations under the 1986 permit over 83 times between March 1986 and April 1987. It also shows over 29 violations between 1981 and March 1986 of the interim limitations set forth in the 1978 permit. Bayonne does

not contest these violations, and I, therefore, find as a matter of law that Bayonne is liable under the Act for the violations at least.

■ Bayonne does, however, contest over 121 additional violations alleged by the United States. These alleged violations occurred between July 1, 1983 and March, 1986, during the time that the 1978 permit was in effect. Although the discharges at the times in question were not great enough to violate the interim standards, they were great enough to violate the original secondary-treatment standards which the interim standards had presumably replaced. The United States argues, however, that as a matter of law, the interim standards lapsed on July 1, 1983, and that Bayonne was thereafter governed by the original 1977 secondary-treatment standards. Under these more stringent standards, Bayonne would certainly be liable for the additional violations alleged.

Bayonne argues in opposition that the terms of the 1978 permit may not be construed as terminating the interim standards on July 1, 1983. Alternatively, Bayonne argues that the terms of the permit are ambiguous. The question before me is whether, as a matter of law, the 1978 permit imposed upon Bayonne the original secondary-treatment standards or the interim standards, during the period beginning on July 1, 1983 and ending when the permit ended in March 1986.

I find as a matter of law that Bayonne's permit extended the city's deadline for abiding by the secondary-treatment standards with July 1, 1983, and no later. I reach this conclusion for the following reasons. First, the Clean Water Act amendments of 1977 make it clear that EPA had no authority to extend secondary-treatment standard deadlines beyond July 1, 1983. The applicable version of Section 1311(i) of the Act, added in 1977 and later altered by further amendment, states in part that when long-term construction or delayed federal finding has prevented the implementation of facilities sufficient to meet the 1977 deadline for improved effluent standards, then the EPA may issue a permit "which shall contain a schedule of compliance for the publicly owned treatment works based on the earliest date by which such financial assistance will be available from the United States and construction can be completed, but in no event later than July 1, 1983." *Cf. Bethlehem Steel Corp. v. Train*, 544 F.2d 657, 660–63 (3d Cir.1976) (in case decided prior to 1977 Amendment of the Act, court held that EPA had no authority to extend statutory 1977 deadline). This statutory limit on extensions is wholly unambiguous. Nor can Bayonne plead ignorance of the statute as an excuse for violating the original secondary-treatment standards after July 1, 1983. *See, e.g., United States v. International Minerals and Chemical Corp.*, 402 U.S. 558, 563, 91 S.Ct. 1697, 1701, 29 L.Ed.2d 178 (1971).

Second, I find that there exists no genuine issue of material fact which prevents a finding that, as a matter of law, Bayonne's permit imposed interim effluent standards until July 1, 1983 only. The following passage from Section C.II of the permit is relevant to this dispute:

The permittee has indicated that the level of treatment currently being afforded the discharge is not meeting the level of treatment as provided for in Section 301(b)(1)(B) and (C) of the Act, and has requested a time extension under Section 30(i) of the Act. Upon review of all the facts presented in this matter, the EPA hereby grants such a time extension provided that the permittee shall comply with the following schedule and shall report to the Regional Administrator and the State Agency within 14 days following each date on the schedule detailing its compliance or non-compliance ...

2. If the Facilities Plan, as approved by the Regional Administrator and the NJSDEP, requires the abandonment of the permittee's treatment facilities and the diversion of sewage flows to a regional treatment facility, the permittee shall comply with the following.

a. Sign a Service Agreement with the HCUA within three (3) months of the approval of the Facilities Plan.

b. Abandon its treatment facilities as soon as possible but in no case later than June 30, 1983.

3. If the Facilities Plan, as approved by the Regional Administrator and the NJSDEP, requires the expansion and upgrading of the permittee's existing treatment facilities to serve as a regional treatment plant, the permittee shall comply with the following:

a. Sign a Service Agreement with the HCUA within three (3) months of the approval of the Facilities Plan.

b. Transfer ownership of its existing treatment facilities to the HCUA within six (6) months of the approval of the Facilities Plan.

4. Upon completion of ownership transfer, this permit shall be modified to include a compliance schedule and any revised effluent limitations which the HCUA must meet by July 1, 1983.

The "Facilities Plan" referred to in this passage is a plan that was prepared by HCUA in accordance with the Act, 33 U.S.C. §§ 1281(c) and 1288, to coordinate sewage treatment operations throughout Hudson County. The plan called for Bayonne to upgrade its POTW, not abandon it. As a result, sections 3 and 4, and not section 2, applied to Bayonne. The EPA has alleged, and Bayonne has not contested, that the Facilities Plan covering Bayonne was approved on May 15, 1980. Thus, the "ownership transfer" referred to in section 4 should have taken place by October 15, 1980. See section 3(b), quoted above. That transfer, however, has never taken place.

Bayonne argues that under a proper reading of section 4, the interim limitations imposed elsewhere in the permit would not be revised until Bayonne transferred ownership of its POTW to HCUA, and at such time, the revisions would be imposed on HCUA only. Since the transfer never occurred, Bayonne asserts that as a matter of law it was exempt from the original secondary-treatment limitations during the life of the 1978 permit. Alternatively, Bayonne argues that the meaning of section 4 is unclear, and creates a genuine issue of material fact as to how long under the 1978 permit it was intended for Bayonne to be exempt from the original limitations.

I reject Bayonne's arguments regarding the meaning of the permit. I find it clear from a reading of sections 3 and 4, quoted above, that when the permit was issued both EPA and Bayonne foresaw the transfer of ownership to HCUA occurring long before the July 1, 1983 deadline. Thus, both EPA and Bayonne foresaw that Bayonne's effluent would meet secondary-treatment standards by that date. That Bayonne might not be capable of meeting those standards on time, because, for example, the HCUA transfer would fall through, is a scenario simply not contemplated within the terms of the documents. Therefore, to the extent that "the parties' intentions," as Bayonne refers to the meaning of the permit, are relevant to the matter at hand, the parties had no intentions regarding the period following July 1, 1983 except compliance with secondary-treatment standards.

Assuming arguendo that I did not find this meaning clearly stated in the permit, I would still be unconvinced by Bayonne's arguments. In essence, Bayonne contends that the 1978 NPDES permits is a contract between EPA and the city, to be given meaning only through the intentions of the regulation and the regulated entity. In a recent opinion issued in a case similar to the one at hand, I rejected this approach to the interpretation of anti-pollution regulations. In *American Lung Association v. Kean*, 670 F.Supp. 1285 (D.N.J.1987), certain private citizens sued the State of New Jersey for failing to enact the air-pollution control measures which had been specified in N.J.'s State Implementation Plan, a document which, in accordance with the terms of the Clean Air Act, had been written by N.J. and approved by the EPA. The State opposed a motion for summary judgment on the issue of liability by arguing that the Plan evinced ambiguous intentions on the part of N.J. and the EPA regarding when, if ever, certain pollution-control measures had to be mandated by state regulation. I granted summary judgment, finding in part that a search for shared intentions was

largely inappropriate in interpreting the Plan. Instead, I found that the regulatory parameters set down by Congress and the interpretation of the Plan by the EPA should largely govern the determination of what the Plan requires. 670 F.Supp. at 1289–91. As with the case at hand, *American Lung* is essentially a pollution-by-permit case; thus, my findings in *American Lung* are equally applicable here, and undercut Bayonne's arguments that the intentions manifested in the 1978 permit preclude summary judgment.

For all these reasons, I find as a matter of law that Bayonne was governed by secondary-treatment effluent standards from July 1, 1983 to March 1986. Thus, Bayonne is liable for all the permit violations alleged by the United States. The United States' motion for partial summary judgment is granted in full.

I turn now to West New York and the West New York Municipal Utilities Authority. These two entities have filed a single set of briefs in opposition to both the United States' motion and the ISC's motion. As with the motions against Bayonne, these motions are partial summary judgment motions on the issue of liability. My decision on these motions is governed by the Rule 56 standards recounted earlier.

The motion brought by the United States against West New York and the West New York Municipal Utilities Authority (hereinafter collectively referred to as "West New York") is essentially identical to the motion brought by the United States against Bayonne: liability is alleged based on the legal theories outlined earlier and on factual submissions, including DMR's, which show violations of the effluent limitations in West New York's NPDES permits. In response, West New York challenges neither the legal theories nor the factual submissions, but instead asserts affirmative defenses. Given this approach by West New York, I shall rely on my earlier exposition of Clean Water Act law and the legal effect of DMR's in deciding the United States' motion.

■ The motion brought by the ISC against West New York is, in essence, iden-

tical to the United States' motions against Bayonne and West New York. The ISC sues not to enforce federal effluent limitations, but to enforce its own Water Quality Regulations. These regulations are promulgated in accordance with the Tri–State Compact under which the ISC Operates. That Compact is in turn the creation of the states of New Jersey, New York and Connecticut acting in concert, with the approval of the U.S. Congress. *See* N.J.S.A. 32:18–1 *et seq.;* N.Y. (McKinney's Consolidated Laws) ECL 21–0501 *et seq.;* Conn. GSA 22a–294 *et seq.;* Congressional Consent, 49 Stat. 932 (1935). Like federal effluent limitations, ISC regulations do, among other things, set effluent limits for certain pollutants. The ISC regulations at issue here set BOD and TSS limitations, and also standards for fecal coliform bacteria, which in high concentrations indicate a danger of infection by intestinal parasites. Despite the fact, however, that the ISC's regulations set forth their own effluent standards separate from federal standards, the enforcement of these ISC regulations may be had in this case through the Clean Water Act in precisely the same manner as federal standards are enforced. In accordance with the Act, the ISC's regulatory standards are set forth in NPDES permits issued by the State of New Jersey as a designated permit authority. *See* 33 U.S.C. §§ 1311(b)(1)(C) and 1342; *see also, e.g., U.S. Steel Corp. v. Train,* 556 F.2d 822, 830 and 837–38 (7th Cir.1977). Such permits make the ISC's standards enforceable NPDES restrictions, and a violation of the standards constitutes a violation of the Act as discussed earlier in the context of the motion against Bayonne. *See* 33 U.S.C. § 1342; *see also, e.g., U.S. Steel Corp.,* 556 F.2d at 830 and 837–38.

In response to the ISC's motion, West New York asserts the same affirmative defenses which it asserts against the United States' motion. It does not challenge the basic Clean Water Act law set out by me in my discussion of the Bayonne motion, nor does it challenge those factual submissions, including DMR's and reports concering on-site ISC inspections, which

show violations of the ISC's standards. Given this approach by West New York, I shall rely on my earlier exposition of Clean Water Act law and the legal effect of DMR's in deciding the ISC's motion.

Furthermore, because the motions by the United States and the ISC are almost identical except for the specific effluent standards, the two plaintiffs seek to enforce, and because West New York offers the same defenses against both motions, I shall consolidate my analysis of the United States' motion and the ISC's motion, addressing my discussion to both motions at once except where I expressly limit it to one motion or the other.

As with Bayonne, West New York owns and operates its own publicly-owned sewage treatment work, or POTW. The West New York POTW receives sewage and wastewater from residential, commercial, and industrial sources in West New York, portions of Weehawken, and portions of Union City. The West New York POTW subjects its sewage and wastewater to primary treatment only, and discharges effluent into the Hudson River.

West New York received its first NPDES permit in 1977, running from December 31, 1977 to December 31, 1981. As with Bayonne's permits, the West New York permit contained effluent limitations based on the achievement of secondary-treatment capability. On July 15, 1981, West New York applied to renew its permit. Consideration of West New York's application was delayed, and the old permit remained in effect in the interim. On April 10, 1986, the N.J. DEP, acting as a designated permit-issuing authority under the Act, issued West New York a new permit, to run from June 1, 1986 to May 31, 1991.

In accordance with the terms of its permits, West New York has monitored the effluent it discharges and has filed DMR's. The United States alleges that DMR's filed by West New York for the period running from April 1, 1981 through April 30, 1987 show that West New York has violated the federal effluent standards in its permits over 275 times. The ISC relies on West New York's DMR's to allege 206 violations of ISC regulations for the period running from January 1982 to April 30, 1987. In addition, the ISC alleges 19 violations of 6–hour time-averaged effluent limitations, documented in 10 on-site inspections by the ISC.

West New York contests none of these allegations. Instead, it bases its defense to the two motions on the following two arguments. According to West New York, the motions must be denied because, first, the U.S. Environmental Protection Agency "permitted its own plan for the construction of a central treatment facility for West New York to be abandoned by its designated representative the HCUA," West New York's brief at 4 (unpaginated), and second, because it is "impossible" for West New York to build treatment facilities capable of achieving the secondary-treatment effluent limitations imposed by West New York's permits. West New York's brief at 4 (unpaginated). Apparently, West New York believes that an imposition of liability for permit violations which were "impossible" to avoid is forbidden by the Clean Water Act, and also by federal constitutional guarantees of "fundamental fairness." Both the first and the second arguments are premised on the following factual allegations, which West New York asserts in part through affidavits. According to West New York, in 1979 HCUA was established under N.J. law as the only entity empowered to build secondary-treatment sewage facilities in Hudson County. The intention of those involved was for HCUA to construct centralized facilities which could be used by a number of municipalities in Hudson County, including West New York, to provide secondary treatment for wastewater and sewage. Some time thereafter, HCUA "went out and banded" for construction funds, and still later "defeased" the bonds and gave up on its attempt to build any facilities. Certification of Robert M. Mayerovic, dated September 30, 1987, at paragraphs 26(b) and 26(c). West New York asserts that the U.S. EPA supported the original HCUA plan and then "allowed" the HCUA effort to die out, all to West New York's prejudice, since the town's ability to meet secondary-treatment

limitations had been tied to HCUA's fortunes. Although West New York admits to having spent time and money since 1985 planning for a secondary-treatment facility of its own, West New York insists that it "cannot put a nail in a piece of wood without the authorization of the HCUA," West New York's brief at 7 (unpaginated), which for some undisclosed reasons is apparently impossible to receive.

Assuming arguendo that all of West New York's factual assertions are true, I find West New York's two arguments to be, as a matter of law, insufficient defenses to plaintiffs' claims of liability.

Addressing them out of order, West New York's second argument is that the Clean Water Act or the federal Constitution, or both, establish an impossibility defense to a claim under the Act. West New York presumably means to invoke the sort of defense recognized in contract law, since the only case cited by West New York in support of its position is *Natus Corp. v. United States*, 178 Ct.Cl. 1, 371 F.2d 450 (1967), a case which recognized that nonperformance of a contract with the federal government could be excused if performance would "bespeak commercial senselessness." 371 F.2d at 457.

I reject West New York's second argument for the following reasons. First, I find that impossibility is not, as a matter of law, a valid defense to Clean Water Act liability. As the *Natus* case points out, impossibility is a defense recognized in the law of contracts, where obligations are grounded on a party's prior expressions of intent to be obligated. The Clean Water Act does not, however, deal in contractual obligations. The Act imposes duties unilaterally, as in the law of torts, and without regard for parties' intention. Specifically, the Act creates a scheme of strict liability for exceeding effluent limitations. *See, e.g., Fritzsche, Dodge & Olcott*, 579 F.Supp. at 1539, note 14; *Monsanto*, 600 F.Supp. at 1485; *Student Public Interest Research Group v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1400 (D.N.J.1985). Thus, it is simply the case that if a party is a permit holder, the Act makes that party liable whenever the party discharges effluent that violates its permit. Excuses are irrelevant; under the Act the party must either achieve the discharge levels it has been allowed, or pay the consequences of its discharge, or stop discharging.

It is clear to me that this is what Congress intended. For any permit holder, the Act's imposition of effluent levels based on secondary-treatment use is not conditioned on the actual achievement of secondary-treatment capability. *See* 33 U.S.C. §§ 1311(a), 1311(b). This shows that Congress meant to shift to polluters, and away from the public as a whole, the burden of failing to achieve secondary treatment capability. The assertion of the sort of defense touted by West New York is wholly antithetical to this statutory purpose, and is therefore at war with the Act.

Nor has West New York pointed to any written law or precedent to support its conclusory assertion that constitutional principles of fundamental fairness mandate an impossibility defense in this case. The reasoning behind such an assertion must be that substantive due process prohibits the strict liability schemes in the common law of torts, and their general acceptance as legitimate legal options for allocating risks and redistributing losses, I shall reject West New York's assertion without further arguments. *Cf. In re: Asbestos Litigations*, 829 F.2d 1233, 1244 (3d Cir.1978) (N.J. Supreme Court did not violate due process by limiting to asbestos cases only its decision in *Beshada v. Johns–Manville Products Corp.*, 90 N.J. 191, 447 A.2d 539 (1982), which invalidated "state-of-the-art" defense to a strict products liability claim).

Second, I doubt whether the facts asserted by West New York would establish a valid impossibility defense here even if such a defense were proper as a matter of law. West New York has failed to allege why the legal barriers it describes, such as HCUA's exclusive franchise on secondary-treatment construction, could not be overcome by a showing to the relevant authorities that West New York seriously desired to clean its own sewage. Given the sad history of inaction on the part of others

who have responsibility for the discharge of Hudson County sewage, it is difficult to believe that West New York could not have even for itself the legal authority to take real steps toward alleviating its own sewage problem, if it so desired. In addition, West New York appears to suggest at page 7 (unpaginated) of its brief that under the law as it now obtains, it could build its own facility if HCUA so authorized. See also the references to "permission" for HCUA at paragraphs 3 and 4 of the affidavit of Robert M. Mayerovic. Yet West New York does not explain why such authorization or permission is impossible to procure. For these reasons, I reject West New York's impossibility defense.

 West New York's first argument is, in effect, an argument that the United States should be equitably estopped from prosecuting this suit as a result of past actions by the EPA. West New York claims that the United States cannot hold West New York liable for its violations when the U.S. EPA had a hand in the failure of the HCUA to clean West New York's sewage. I note first of all that this argument cannot, based on the facts asserted by West New York, be posed against the ISC on its motion. In any event, I find it to be an insufficient defense to the United States' motion.

 Current law allows for the assertion of an equitable estoppel defense against the United States in certain limited circumstances. *See United States v. Asmar*, 827 F.2d 907, 911–13 (3d Cir.1987) (*citing inter alia, Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). Such a defense cannot be asserted, however, unless the party asserting it shows, at the very least, that in committing the complained-of acts it reasonably relied to its detriment on a prior position taken by the United States. *Asmar*, at 912.

 In the case at hand, West New York alleges that "[w]hen the permit for effluent discharges was issued to West New York it entered and agreed to the permit conditions with the understanding that" HCUA would, with the aid of the EPA, build a plant which West New York could rely upon to provide secondary-treatment for its effluent. West New York's brief at 5 (unpaginated). Assuming that the truth of this assertion, I find that such reliance was unreasonable as a matter of law.

I note first that, as a general rule, "those who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law." *Community Health Services of Crawford County*, 467 U.S. at 63, 104 S.Ct. at 2225; *see Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1416 (10th Cir.1984). The relevant law in this instance is the Clean Water Act, and West New York must be charged with knowledge of certain basic precepts of the Act which make their claim of reasonable reliance wholly untenable as a matter of law.

First, the Act imposes a nondiscretionary duty on the EPA to take action to prevent permit violations, including the issuance of compliance orders by the Administrator and the filing of civil lawsuits. 33 U.S.C. § 1319(a) ("the Administrator *shall* issue an order requiring [a permit holder] to comply with [its permit limitations] or *shall* bring a civil action" to force compliance) (emphasis added); *see, e.g., South Carolina Wildlife Federation v. Alexander*, 457 F.Supp. 118, 130–34 (D.S.C.1978); *United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181 (D.Ariz.1975). Thus, EPA had no authority to avoid moving against West New York if West New York violated its permits, and West New York had no reasonable basis for presuming that in such circumstances, EPA could or would choose not to take action, including the filing and prosecution of this lawsuit, even when EPA was simultaneously involved in aiding the construction of a secondary-treatment plant for West New York.

Second, as I discussed earlier, the Act does not condition the imposition of effluent limitations based on secondary-treatment on the actual availability of secondary-treatment. Within the statutory scheme presented by the Act, the provisions related to permits, effluent limita-

tions, and liability and the provisions related to treatment plant construction proceed on two separate, albeit parallel, tracks; the former establishing the duties of permit holders, and the latter establishing a means to aid permit holders in fulfilling their duties. Contrast Subchapters I and II of Title 33, Chapter 26, concerning pollution-control research and construction grants, with Subchapter III, IV and V, concerning permits and enforcement. *See also* 33 U.S.C. § 1281, which states that the purpose of Subchapter II, concerning construction grants, is not to provide secondary-treatment capability, but rather merely "to require and *to assist* the development and implementation of better waste treatment practices" (emphasis added). Therefore, whatever promises or representations EPA might conceivably have made concerning the HCUA plant could have had nothing to do with West New York's obligations under its permits. If West New York drew some connection between such promises or representations and West New York's permit obligations, it did so in utter disregard for the distinction drawn in the Act between that which permit holders must do, and that which the federal government may to aid permit holders.

Finally, I note that under the Act, liability for permit violations may be enforced by parties other than the U.S. Government. *See* 33 U.S.C. § 1365 (citizen suits) and § 1319(a) (state enforcement actions). Thus, it would have been unreasonable in any event for West New York to have assumed some sort of immunity from civil prosecution based on the actions of only one potential plaintiff out of many. For all these reasons, I reject West New York's equitable estoppel defense.

In short, I reject West New York's defenses to the two partial summary judgment motions. The United States' motion and the ICS' motion are both granted in full.

In conclusion, I have found Bayonne liable under the Clean Water Act for exceeding federal limitations on effluent in the wastewater and sewage that Bayonne discharges into the Kill Van Kull. I have found West New York liable under the Clean Water Act for exceeding federal limitations and limitations imposed by the Interstate Sanitation Commission on effluent in the the wastewater and sewage that West New York discharges into the Hudson River. I have already granted the unopposed partial summary judgment motions brought by the United States against North Bergen and its municipal utilities authority and by the ISC against North Bergen, its utilities authority, and Bayonne.