CALIFORNIA PUBLIC INTEREST RESEARCH GROUP, et al., Plaintiffs,

v.

SHELL OIL COMPANY, Defendant.

Nos. C92–4023 TEH, C93–0622 TEH.

United States District Court, N.D. California.

Dec. 22, 1993.

Linda L. Hagerty, George D. Niespolo, Robins, Kaplan, Miller & Ciresi, San Francisco, CA, David A. Nicholas, Charles C. Caldart, National Environmental Law Center, Boston, MA, for plaintiffs.

John F. Barg, R. Christopher Locke, Mary J. Decker, Landels, Ripley & Diamond, San Francisco, CA, for defendant.

## ORDER

THELTON E. HENDERSON, Chief Judge.

This matter came before the Court on Monday, December 13, 1993, on plaintiffs' motion for partial summary judgment. Plaintiffs seek a ruling that Shell Oil Company has discharged selenium into the San Francisco Bay in amounts exceeding that allowed by its permit. Having carefully considered the parties' written and oral arguments, and the record herein, the motion is granted for the reasons set forth below.

### BACKGROUND

Toxic chemicals and pollutants are discharged every day into the San Francisco Bay from dozens of urban industrial and agricultural sources. The agency responsible for regulating these discharges is the California Regional Water Quality Control Board, San Francisco Region (hereafter "Water Board"). Acting under the mantle of the Clean Water Act, 33 U.S.C. § 1251 et seq., the Water Board issues National Pollution Discharge Elimination System permits ("NPDES permits"), which impose enforceable limits on the amount of pollutants that defendant Shell Oil Company ("Shell"), and other industrial sources, can lawfully discharge into the San Francisco Bay. 33 U.S.C. §§ 1251(b), 1342.[1]

In light of mounting evidence that high concentrations of selenium were harming the San Francisco Bay,[2] the Water Board issued an order modifying Shell's NPDES permit in February 1991. The well publicized order

---

1. The San Francisco Bay—Delta Estuary has been selected for inclusion in the federal National Estuary Program ("NEP"), which is designed to develop plans for protecting estuaries of national significance. 33 U.S.C. § 1330. According to a 1992 NEP report, the San Francisco Bay is the most modified large estuary in the nation. Ninety two percent of the estuary's historic tidal marshes have been destroyed, and "water quality has declined as pathogens and toxic chemicals from urban and agricultural runoff from over 100 municipal and industrial sources enter the estuary." Nicholas Decl., Exh. H. at 60–61.

2. Selenium is a nonmetallic chemical element found naturally in crude oil and soil which becomes harmful when concentrated in larger quantities. In 1992, the California Department of Health Services ("DHS") issued a health warning to the public advising against eating any duck livers from the San Francisco Bay or eating more than 4 ounces of certain waterfowl from the Bay in any two week period because of elevated selenium levels. Pregnant women, nursing mothers, and children under age 15 are advised not to eat any scaup or scoters from the Bay. See Nicholas Decl., Exh. E.

Significantly elevated levels of selenium have also been found in white sturgeon and in the

required Shell's oil refinery in Martinez, California—the largest industrial source of selenium in the Bay—to reduce its selenium discharges by more than half of current levels to a running annual average of 2.13 lbs/day. To give Shell time to comply with this standard, the Board delayed its implementation until December 12, 1993. *See* February 1991 Water Board Order No. 91–026.[3]

Four months later, however, concerns over selenium in the Bay prompted the Water Board to impose interim selenium limits, pending implementation of the 2.13 lbs/day standard on December 12, 1993. Thus, in June of 1991, the Water Board again modified the NPDES permit to impose interim selenium limits on six refineries, including a limit of 5.8 lbs/day for Shell. The Water Board explained that these interim limits were based on recent discharge data for each refinery, and thus were "intended to be a cap on current performance." *See* June 19, 1991 Water Board Order No. 91–099.

In 1992, plaintiffs CALPIRG[4], and individual CALPIRG members, filed suit against Shell under the citizens' suit provision of the Clean Water Act. 33 U.S.C. § 1365. The complaint alleges, *inter alia*, that Shell has been discharging selenium in excess of the interim 5.8 lbs/day limit set forth in its NPDES permit. This allegation is based on Shell's own monitoring data, which shows that Shell exceeded the 5.8 lbs/day standard for parts of 1991 and most of 1992. In late 1992, Shell's selenium discharges were calculated at 7.1 lbs/day, representing a 22 percent increase over the 5.8 lbs/day interim numeric limit. Plaintiffs also allege, on information and belief, that Shell will violate the stricter 2.13 lbs/day standard on dates after December 12, 1993.[5]

Plaintiffs now seek a partial summary judgment as to liability with respect to their claim regarding selenium, and then only with regard to the interim standard. Specifically, they seek a ruling that Shell has exceeded the terms of its interim NPDES permit, and hence violated the Clean Water Act, by discharging selenium in excess of 5.8 lbs/day. Shell opposes the motion, arguing that, based on its reading of the permit, plaintiffs have failed to prove a violation of interim NPDES permit. Shell also contends that a variety of other issues create triable questions of fact precluding summary judgment.

*DISCUSSION*

Disturbed by increasing pollution of our Nation's waters, Congress enacted the Federal Water Pollution and Prevention Control Act (also known as the Clean Water Act) to "restore and maintain [their] chemical, physical, and biological integrity." 33 U.S.C. § 1251(a); *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1483 (9th Cir.1987), *vacated and remanded on other grounds*, 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988). To achieve this objective, Congress prohibited the discharge of pollutants, such as selenium, into navigable waters, except as authorized by a NPDES permit. 33 U.S.C. §§ 1311(a), 1342; *Sierra Club*, 813 F.2d at 1483.

■ This statutory scheme makes dischargers, such as Shell, "strictly liable" for any violation of a NPDES permit. *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979); *United States v. Sinclair Oil Co.*, 767 F.Supp. 200, 205 (D.Mont.1990); *United States v. City of Hoboken*, 675 F.Supp. 189, 198 (D.N.J.1987). Thus, neither good faith, impossibility, nor data reporting errors, are accepted as valid defenses to liability, *Sierra Club*, 813 F.2d at 1491–92; *Hoboken*, 675 F.Supp. at 198; *Student Public Interest Research Group ("PIRG") v. AT & T Bell Laboratories*, 617 F.Supp. 1190, 1203 (D.N.J.1985), although such factors may be

eggs of nesting birds. *See* Water Board Selenium Verification Study 1988–1990, May 1991, Nicholas Decl., Exh. F. The DHS is presently considering whether to issue a health warning with respect to eating white sturgeon. *Id.* at xiii.

3. This date may be extended into 1998 as a result of litigation pending in Solano County Superior Court. *See Western States Petroleum Association ("WSPA") v. The California Regional Quality Control Board*, Civ. No. 121078.

4. CALPIRG, or California Public Interest Research Group, is a non-profit organization, which, among other things, advocates for protection of the natural environment.

5. The Pacific Coast Federation of Fishermen's Associations also filed suit against Shell, alleging the same violations. That action, C93–0622, has been consolidated with this case. This motion, however, is brought only by the plaintiffs in the CALPIRG case, No. C 92–4023.

relevant to the penalty phase. 33 U.S.C. § 1319(d). In short, "[e]xcuses are irrelevant; under the [Clean Water] Act the party must either achieve the discharge levels it has been allowed, or pay the consequences of its discharge, or stop discharging." *Hoboken*, 675 F.Supp. at 198.[6]

Citizen groups, such as CALPIRG, are expressly authorized to sue dischargers to enforce limits contained in NPDES permits, where the relevant government agency fails to take its own enforcement action upon being given 60 days notice of an intent to sue. 33 U.S.C. § 1365. Thus, the *only* issue in an NPDES enforcement action, such as the case at bar, is whether there has, in fact, been a violation of the NPDES permit.

The specific language of Shell's NPDES permit is as follows:

The Dischargers named below shall comply with the following selenium effluent mass emission rates listed below, effective immediately . . .

These limits are intended to be a cap on current performance, and any enforcement action by the Board will be based on violation of that narrative standard as well as violation of the explicit number limits listed below . . .

Discharger: Mass emission rate: (running annual average)**

Shell     5.8 pounds/day

. . .

** The running annual averages are to be calculated by taking the arithmetic average of the current daily mass loading value with all of the previous years values. Compliance is to start immediately upon adoption of this Order, with use of retrospective data in calculation of the average.

6. If a permit expressly contains or incorporates an "upset defense," this may provide a valid excuse to noncompliance. *Sierra Club*, 813 F.2d at 1486–88. The upset defense only concerns "exceptional incident[s] in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee." 40 C.F.R. § 122.41(n). *Sierra Club*, 813 F.2d at 1484. The NPDES permit at issue here contains no such upset defense.

7. Neither the Water Board nor the Environmental Protection Agency is under any obligation to

June 19, 1991 Order No. 91–099. As the above indicates, Shell's NPDES permit refers to both a *numeric* standard (the 5.8 lbs/day limit) and a *narrative* standard, which is the language stating that "these limits are intended to be a cap on current performance."

Plaintiffs contend that they need only show that Shell has discharged selenium in excess of the numeric standard to prove a violation of the NPDES permit, and thus secure a summary judgment on liability. The clear purpose of the June 1991 amendment, they argue, was to impose an enforceable numeric standard, "effective immediately" so as to prevent any additional discharge of selenium into the Bay over then current levels. *Id.* The "narrative" language, they add, should not be construed to limit or undercut this purpose. Rather, this language, properly construed, simply reflects (1) the Board's expectation that Shell would be able to comply with the numeric 5.8 lbs/day standard if it did not change its "current performance" (given that the 5.8 lbs/day figure was calculated from Shell's own discharge data), and (2) the Board's expression of how it would exercise its prosecutorial discretion in case of a violation.[7] Accordingly, plaintiffs need not prove that Shell has actually changed its operations in order to establish a violation of the NPDES permit.

As discussed above, Shell has admittedly exceeded the 5.8 lbs/day interim numeric standard numerous times over the 1991–1992 period. Thus, if we accept plaintiffs' interpretation of the NPDES permit, Shell is indisputably in violation, and partial summary judgment as to liability is appropriate.

prosecute every violation of a NPDES. Rather, such agencies may exercise their discretion in determining which violations will be pursued, in accordance with resources and priorities. As the Executive Director of the Water Board explained, "the Board's enforcement authority is discretional [sic]; and where appropriate, the Board intends to give indications as to where it will or will not exercise that discretion." Ritchie Depo. at 94. Indeed, the citizens' suit provision of the Clean Water Act specifically contemplates that citizens will enforce NPDES violations where agencies decline to do so. 33 U.S.C. § 1365.

Shell contends, however, that it can not be found liable for violating its NPDES permit absent a proven violation of both the 5.8 lbs/day numeric standard *and* the narrative standard. In other words, Shell reads the permit to impose the 5.8 lbs/day limit *only if* there is a change in its "current performance" or operations. So long as plaintiffs cannot prove such a change, the 5.8 lbs/day limit has no effect, and Shell can discharge selenium in excess of this standard without violating the permit. And since, as Shell points out, the issue whether Shell has changed its "current performance" is genuinely disputed, no summary judgment may be granted at this juncture.

■■■ The parties' dispute over the meaning of the NPDES interim permit presents a "question of law" for the court to decide. *See Student PIRG of New Jersey v. American Cyanamid Co.,* 23 E.R.C. 2044, 2050, 1985 WL 186630 (D.N.J.1985) ("interpretation of the terms of a [NPDES] permit is purely a question of law"); *AT & T Bell Laboratories,* 617 F.Supp. at 1205. An NPDES permit is not a contract; rather it is a legally enforceable rule drafted by a regulatory agency. As such, it is akin to any agency regulation or rule, which a court would normally interpret.[8, 9]

■■ Using traditional tools of statutory construction, we find, as a matter of law, that a violation of the numeric standard for selenium set forth in the NPDES interim permit constitutes a violation of the permit. As explained below, not only has this construction been affirmatively endorsed by the Executive Director of the Water Board, but it is most consistent with the language of the permit and its underlying purpose.

### 1. The Water Board's Interpretation

In construing NPDES permits, courts often defer to the agency that drafted the permit, consistent with established rules of statutory construction that give deference to agency interpretations where they are reasonable. *See Yates,* 790 F.Supp. at 514 (clarifying ambiguity in permit "through methods which preserve the proper deference to the responsible agency"); *American Cyanamid Co.,* 23 E.R.C. at 2050 (adopting agency interpretation of NPDES permit that was "rational").

Here, the Executive Director of the Water Board, Steven Ritchie ("Director"), has testified that the "narrative standard" language was "not intended to modify the numeric selenium standard of 5.8 pounds/day." Rather, its only purpose was to explain how the 5.8 lbs/day figure was derived, and to signal how the Board would exercise its prosecutorial discretion. A violation of the narrative standard, he concludes, is not required to prove a violation of the NPDES permit:

> The intent of [the cap on performance] language is to indicate the basis for the numeric limits and to indicate under what circumstances the *Board* would take enforcement action against Shell and the other refineries. It indicates how the Board would exercise its prosecutorial discretion in bringing an enforcement action. *Under the Order, it is not necessary to prove a violation of any narrative standard in an enforcement action relating to selenium.*

Ritchie Decl. at 2–3 (emph. added and in original). The Director reaffirmed this declaration testimony in his subsequent deposition. *See* Ritchie Depo. at 94–95. In short,

---

8. We also note that in cases where parties dispute the nature or extent of obligations imposed by agency drafted State Implementation Plans or "SIPs," promulgated under the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the proper interpretation of the SIP is treated as a question of law for the Court to decide. *See generally Coalition Against Columbus Center v. New York,* 967 F.2d 764, 771 (2nd Cir.1992); *Citizens for a Better Environment v. Deukmejian,* 731 F.Supp. 1448 (N.D.Calif.1990), *reconsideration granted in part,* 746 F.Supp. 976 (1991). Since a SIP and a NPDES permit serve similar purposes—both involve agencies imposing enforceable standards or reg-

ulatory requirements on polluters—we find this precedent to be relevant here.

9. Even if we were to conclude that the proper interpretation of the permit presented an issue of fact, we would still find that there was no "genuine" issue of fact precluding summary judgment, given that the evidence submitted by the parties overwhelmingly favors the plaintiffs' interpretation. *See PIRG of New Jersey v. Yates,* 790 F.Supp. 511, 514 (D.N.J.1991) (finding no "**genuine** issue of fact" where evidence overwhelmingly favored one interpretation) (emph. added).

the Water Board could not be clearer: Shell is in violation of the NPDES permit when it violates the 5.8 lbs/day standard; proof that Shell has, in addition, deviated from its "current performance" is not required.

Shell emphasizes that the Water Board has not yet formally determined whether Shell has violated the narrative standard, and has admitted that it would not exercise its discretionary enforcement authority until such a determination was made. However, neither statement is inconsistent with the Director's declaration or deposition testimony; thus, they do not aid Shell's position.

Shell also suggests that the Board's decision not to exercise its enforcement authority, absent a determination that the narrative standard has been violated, means that no violation of the permit can, in fact, occur unless both the numeric and narrative standard are violated. This argument completely ignores the distinction between what constitutes a violation of the permit, and the circumstances under which the Board would choose to exercise its enforcement authority.[10]

### 2. *Underlying Purpose and Language of the NPDES Permit*

As the Court indicated above, deference to agency interpretations is only appropriate where the interpretation is found to be reasonable. Based on our examination of underlying purpose and language of the NPDES permit, the Water Board's interpretation in this instance is clearly reasonable.

First, the Water Board's interpretation is consistent with the overall purpose of the June 1991 NPDES permit, which was to prevent any additional selenium pollution of the Bay, beyond that reflected by the discharge data available at the time—pending implementation of the permanent selenium limits, effective December 12, 1993. As, the June 1991 amended NPDES permit expressly stated:

*The [Water] Board and [EPA] believe that an increase in the emissions of selenium would be contrary to the requirements under Section 304(L) of the Clean Water Act. In addition, Federal and State antibacksliding and antidegradation regulations under the Clean Water Act apply, as beneficial uses in San Francisco Bay have been impaired due to selenium discharges. The Board therefore proposes, that in addition to the final [limits], to now establish interim limits for all six refineries, that would cap their selenium discharge at their current performance.*

Ritchie Decl., Exh. A., at 1–2. (emph. added).

Second, the NPDES permit expressly states, at different points, that the interim numeric limits shall be "effective immediately" and that "[c]ompliance [with the numeric interim limits] is to start immediately upon adoption of this Order." *Id.* at 3. This language clearly supports the Water Board's interpretation that the 5.8 lbs/day standard was intended to be an enforceable standard that was effective *immediately*—as opposed to a standard that only became enforceable if, and when, Shell changed its "current operations." Thus, the Water Board's construction comports with the express language in the permit making the interim numeric limits for selenium effective immediately.

Finally, the Water Board's interpretation reasonably harmonizes both the narrative and numeric standards. Under the Water Board's view, the narrative standard language was added to explain how the 5.8 lbs/day figure was arrived at, and to indicate how the Board would exercise it prosecutorial discretion. This explanation gives meaning to the narrative standard language while still respecting the express language making the 5.8 lbs/day standard "effective immediately."

---

**10.** Indeed, the Director underscored the discretionary nature of the Board's prosecutorial activity at his deposition. There, the Director noted that there had, in fact, been an internal decision as to whether to proceed with an enforcement action, and that the Board has indicated, in meetings with Shell representatives in April or May of 1993, that enforcement proceedings for violation of the interim effluent limits for selenium were "quite likely." However, given the instant action, and other litigation, the Board is "currently withholding" its internal decision. Ritchie Depo. at 40.

In contrast, Shell's reading of the permit, as imposing only a performance based standard, conflicts with both the language and purpose of the NPDES permit. First, it renders the 5.8 lbs/day standard dormant, until such time as a change in operations is proven. We find this result difficult to square with the express language in the permit making the numeric limits effective immediately. Second, it is contradictory to the expressed goal of the June 1991 NPDES permit—to prevent selenium discharges from rising beyond then current levels.

Nor is Shell's position significantly aided by a March 18, 1991 letter from the Director to Shell. This letter, upon which Shell largely relies, states, in part, that the interim selenium limits would "not require any additional source control or treatment measures in the interim." Locke Decl., Exh. A at tab 7. However, from the context of the letter it appears that this is what the Board expected to occur "in theory" because the 5.8 lbs/day standard was derived from Shell's actual selenium discharges under "current performance." Indeed a subsequent Water Board internal memo explains that the "interim limit ... would not allow an increase, but, *in theory*, should not involve any immediate selenium reduction through treatment, or source control." *Id.* at tab 8 (emph. added). Significantly, both the March 18, 1991 letter, and the subsequent internal memo specifically state that the interim limits would prohibit any increase in the emission of selenium, consistent with federal anti-degradation policies. Neither provide justification for rejecting the Water Board's reading of its NPDES permit.[11]

■ In sum, the Water Board's construction of Shell's interim NPDES selenium permit is clearly reasonable, given both the language and underlying purpose of the permit; as such, it deserves substantial deference in this instance. *Yates,* 790 F.Supp. at 514; *American Cyanamid Co.,* 23 E.R.C. at 2050; *cf. Navistar Int'l Transportation Corp. v. E.P.A.,* 858 F.2d 282, 286–88 (6th Cir.1988) (following same approach in Clean Air Act case). Nor has Shell proffered any persuasive reason as to why this interpretation should be rejected. Accordingly, we construe the interim NPDES permit to impose a numeric selenium limit, effective as of the date of the permit, the violation of which constitutes a violation of the permit.

■ In addition to its reading of the permit, Shell offers other defenses to liability. We find, however, that they are equally unavailing. For example, Shell contends that it does not possess the technology to significantly reduce the selenium discharged by its refinery process and that, at best, there is a factual dispute as to the availability of such technology. We have no doubt that the availability of selenium reduction measures, and the adequacy of Shell's efforts in this regard, are matters upon which the parties disagree; however, given the strict liability imposed by the Clean Water Act, they are simply beside the point for purposes of determining liability.[12]

■ Shell also complains that the 5.8 lbs/day figure did not fairly represent its current performance, in June of 1991, and should have been adjusted higher by the Water Board. However, any challenge to effluent limits in an NPDES permit presents a matter for the Water Board, not this Court, to address. *See PIRG of New Jersey v. Star Enterprise,* 771 F.Supp. 655, 666–67 (D.N.J. 1991); *Natural Resources Defense Council,*

---

11. Shell also belatedly points to a proposed Cease & Desist order in the *WSPA* litigation, note 3, *supra,* to support its interpretation of the NPDES permit. According to Shell, the Water Board's description of the NPDES permit in paragraph five of the Cease and Desist order supports Shell's interpretation. However, a plain reading of the language at issue belies this assertion. It states that in June 1991, the Regional Board amended the Shell's permit to "include *immediately effective* interim discharge *limits calculated on the basis of each refinery's "cur-*

rent performance."* (emph. added). This language is completely consistent with the view that the NPDES permit imposed immediately effective numeric limits that were calculated using recent discharge data.

12. Even in the absence of readily available technology, there are other possible avenues for achieving compliance, such as using crude oils with lower selenium deposits or reducing operations.

*Inc. ("NRDC") v. Outboard Marine Corp.,* 692 F.Supp. 801, 809–811 (N.D.Ill 1988).

█ Finally, Shell urges the Court to refrain from ruling on the motion because it is challenging the NPDES permit in litigation in state court. *See Western States Petroleum Assoc. et al. v. The California Regional Water Quality Control Board,* Solano County Superior Court, Civ. No. 121078 (or "WSPA" litigation). However, courts have consistently rejected attempts to avoid liability in enforcement actions because of pending challenges in other courts. *See Star Enterprise,* 771 F.Supp. at 666–68; *NRDC v. Outboard Marine,* 692 F.Supp. at 810–11; *Student PIRG of New Jersey v. Monsanto Co.,* 600 F.Supp. 1479 (D.N.J.1985).

*CONCLUSION*

For all the reasons set forth above, we find that plaintiffs have established that there is no genuine dispute that Shell has discharged selenium in excess of the 5.8 lbs/day limit permitted by its NPDES permit for the weeks beginning September 2, 9, 16, 23, and 30, and October 7, 1991, and every week from February 10, 1992 through the week of December 28, 1992. This determination is sufficient, as a matter of law, to establish that Shell has violated its interim NPDES selenium permit. Accordingly, plaintiffs' Motion for Partial Summary Judgment with respect to liability is HEREBY GRANTED. Fed. R.Civ.P. 56.

Given this ruling, defendant is subject to such remedies as the court may find appropriate under 33 U.S.C. § 1365(a). Within 21 days of the date of this order, the parties shall meet and confer in good faith to determine whether this next stage in the proceedings can be informally resolved. The parties shall appear for a status conference on Tuesday, January 25, 1993 at 3:00 p.m. Status Conference statements, in conformance with the Local Rules, shall be filed five calendar days in advance. Such statements shall address how the parties intend to proceed with all remaining claims in this case.

IT IS SO ORDERED.