**OREGON STATE PUBLIC INTEREST RESEARCH GROUP, INC., Diane Heintz, and Rena Taylor, Plaintiffs,**

v.

**PACIFIC COAST SEAFOODS COMPANY, Pacific Surimi Joint Venture, LLC, Pacific Surimi Company, Inc., and Dulcich, Inc. d/b/a Pacific Seafood Group, Defendants.**

No. CV 02–924–HA.

United States District Court, D. Oregon.

March 15, 2005.

Charles C. Caldart, National Environmental Law Center, Seattle, Washington, Joseph J. Mann, National Environmental Law Center, San Francisco, CA, Karl G. Anuta, Sokol & Anuta, P.C., Portland, Oregon, for Plaintiffs.

Jerry B. Hodson, Suzanne Lacampagne, Hong N. Huynh, Miller Nash LLP, Portland, Oregon, for Defendant.

## OPINION AND ORDER

HAGGERTY, Chief Judge.

Plaintiffs filed this case in July 2002, alleging violations of the Clean Water Act (CWA or the Act). Plaintiffs assert that defendants are committing ongoing violations of the CWA at their Warrenton, Oregon seafood processing facility. Plaintiffs claim that defendants are discharging excessive seafood processing waste into the Skipanon River, causing dissolved oxygen levels to fall to levels that are toxic to fish and other aquatic life. Plaintiffs seek a declaration regarding defendants' violations, an injunction requiring defendants to attain compliance and remediate the harm caused by their violations, the imposition of civil penalties, and the award of costs of litigation as provided by the CWA.

Before the court is plaintiffs' Motion for Partial Summary Judgment. In this motion, plaintiffs seek a declaration that defendant Pacific Coast Seafoods (Coast) has committed violations of certain discharge limits in its National Pollution Discharge Elimination System (NPDES) permit on 808 days since 1999. Plaintiffs further seek a declaration that defendants Pacific Surimi JV and Pacific Surimi Co. (collectively referred to as Pacific Surimi) have violated the CWA every day they have operated without an NPDES permit (332 days) and have committed violations of certain discharge limits in the applicable enforcement order, discussed below, on 433 days since 1999. Oral argument on plaintiffs' motion was heard on March 7, 2005. For the following reasons, plaintiffs' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It is unlawful to discharge any pollutant into the waters of the United States unless those discharges are made in compliance with the CWA. 33 U.S.C. § 1311(a).

The NPDES permit program is the cornerstone of the CWA's pollution control scheme. *Natural Res. Defense Council, Inc. v. EPA,* 822 F.2d 104, 108 (D.C.Cir. 1987). An NPDES permit allows the holder to discharge pollutants at levels below thresholds incorporated in the permit. 33 U.S.C. § 1342(a); 40 C.F.R. § 122.1 *et seq.*

The Environmental Protection Agency (EPA) is charged with administering the NPDES permit system, but may delegate this authority to the state government. 33 U.S.C. § 1342(b). Oregon's certified NPDES program is managed by the Oregon Department of Environmental Quality (DEQ). O.R.S. 468.035; O.R.S. 468.065; *see also ONRC Action v. Columbia Plywood, Inc.,* 332 Or. 216, 26 P.3d 142, 143 (2001).

### 1. Pacific Coast

Defendant Coast owns a seafood processing plant in Warrenton, Oregon (the facility) and has operated the facility since 1983. Pacific Surimi operates in a portion of the facility. Coast and Pacific Surimi discharge wastewater from their processing operations from a common pipe into the Skipanon River, a tributary of the Columbia River.

Pursuant to the NPDES program, DEQ issues permits to dischargers. A general permit covers an entire group or category of similarly situated but separately located facilities. In contrast, an individual permit is issued to one facility based on site-specific information related to it. Substantively, a general permit is no different from an individual permit; it must include the same permit limitations required in individual permits.

Since June 1999, Coast has been covered by the DEQ's 900–J 1999 General Permit for seafood processors (the 1999 permit). Previously, Coast was covered under the 1992 NPDES permit (1992 permit). The permits set numeric discharge limits for biochemical oxygen demand (BOD), total suspended solids (TSS), oil, and grease. *See* Attachment to Plaintiffs' Concise Statement of Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment, Ex. 7 (Attach. Pls.' CSF). The 1999 permit requires seafood processors to monitor their wastewater and report the results on a monthly basis to the DEQ.

Plaintiffs assert that Coast has violated the CWA repeatedly by discharging TSS, oil, and grease in excess of limits imposed by the NPDES permit. They also contend that defendants Pacific Surimi have violated the CWA repeatedly by discharging pollutants without an NPDES permit, and that they have violated the CWA by discharging BOD, oil and grease in excess of the limits prescribed by the Stipulated Consent Order (SCO), which is also known as a state enforcement order.

Plaintiffs contend that from July 1999 through June 2004, Coast has committed 606 days of violation of TSS limits and 202 days of violation of oil and grease limits (808 days). This includes, plaintiffs assert, 167 days of TSS violations after the filing of the Complaint in July 2002.[1]

Defendants acknowledge that they have committed violations, but argue that based

---

1. In its Motion, plaintiffs asserted that Coast had committed 2,396 days of violation. However, in its Reply Memorandum, plaintiffs reduced the number of violations to 808, including only days when Coast processed a particular species in a given month. Plaintiffs defer for a later date calculating alleged violations for which defendants have raised factual disputes.

on relevant discharge monitoring reports (DMRs) and the proposed Mutual Agreement and Order (MAO) previously issued by the DEQ, Coast committed thirty-four violations of TSS, twelve of which occurred after the filing of the Complaint, and fifteen violations of oil and grease limits, four of which occurred after the filing of the Complaint.

## 2. Pacific Surimi

Prior to 1999, Pacific Surimi's wastewater discharges were covered by the 1992 permit. When the DEQ renewed the permit in 1999 it excluded surimi processors, including Pacific Surimi.[2] The DEQ noted that due to the wastewater produced by surimi operations, "[f]acilities that process surimi will need to apply for an individual NPDES permit," and, specifically, that "Pacific Surimi will require an individual NPDES permit in order to discharge [its] wastewater." Caldart Decl. I, Ex. 11 at 2.; Attach. Pls.' CSF, Ex. 8. The DEQ then entered into an SCO in June 1999 (the 1999 SCO) with Pacific Surimi. When the DEQ issued the 1999 SCO, it did so "in lieu of [an] NPDES permit while the permits [were] being drafted." Declaration of Hong N. Huynh in Support of Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Huynh Decl.), Ex. 13 at 1. NPDES permits must go through a full public process before they can be issued. This process can last for several months. Caldart Decl. I, Ex. 25 at 1; OAR 340–45–035. Similar to the 1992 and 1999 permits, the 1999 SCO requires Pacific Surimi to monitor its wastewater and report the results on a monthly basis to the DEQ. The 1999 SCO is intended to remain in effect until Pacific Surimi obtained an individual NPDES permit.

In November 1999, Pacific Surimi applied for an NPDES permit. The DEQ responded that Pacific Surimi had to complete a mixing zone study, as required by the 1999 SCO, before the DEQ would issue a permit. In 2001, Pacific Surimi issued the results of its study to the DEQ. The DEQ has yet to issue a permit and Pacific Surimi continues to operate under the 1999 SCO.

Plaintiffs contend that the DMRs submitted by Pacific Surimi to DEQ indicate 275 days of violation of BOD limits and 158 days of violation of the oil and grease limits, including eighty days of BOD violations and fourteen days of oil and grease violations after the filing of the Complaint, for a total of 433 days of violations. In addition, plaintiffs assert that Pacific Surimi has committed 332 days of violation for discharging without an NPDES permit.[3]

Defendants acknowledge that there have been violations. However, they assert that

2. In deciding to exclude surimi processors from coverage of the 1999 permit, the DEQ stated that "[s]urimi processing yields a high strength waste stream that is high in fine organic suspended material and primarily soluble BOD. Conventional treatment ... is not effective in treating this wastewater; more complex treatment facilities ... are necessary. The treatment technology used along with water quality issues will have to [be] considered in developing effluent limits for these facilities. It is likely that such a treatment facility will require more oversight and monitoring. Even with complex treatment,

the pollutant loads discharged by facilities that process surimi are very high." Declaration of Charles C. Caldart in Support of Plaintiffs' Motion for Partial Summary Judgment (Caldart Decl. I) Ex. 11 at 1–2.

3. In its Motion, plaintiffs asserted that Pacific Surimi violated the Act every day it has operated without an NPDES permit and have committed 626 days of violation of the DEQ enforcement order. However, in its Reply Memorandum, plaintiffs have reduced the number of violations to a total of 433 days of violation of effluent limits and 332 days of

the relevant DMRs show that Pacific Surimi committed twenty-three days of violation of BOD limits, four of which occurred after the Complaint was filed, and nine days of violation of oil and grease limits, only one of which occurred after the Complaint was filed. Defendants acknowledge a total of thirty-two days of violations.

**STANDARDS**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court evaluates all of the evidence presented, and any reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1140 (9th Cir.2003) (citations omitted).

The moving party carries the initial burden of proof. The party meets this burden by identifying portions of the record on file that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once this initial burden is satisfied, the opponent must demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.* The non-moving party then must produce evidence that disproves or calls into question the movant's contentions. *Id.*

**ANALYSIS**

**1. Subject Matter Jurisdiction and Standing**

■ Defendants argue that this court has only limited subject matter jurisdiction

over plaintiffs' claims because plaintiffs have failed to show that defendants are committing ongoing violations of NPDES permit limitations for shrimp, crab, and hand-butchered salmon wastewater. This argument lacks merit.

■ The CWA authorizes citizen suits against a person "alleged to be in violation of (A) any effluent standard or limitation under this chapter or (B) an order issued by ... a State with respect to such standard or limitation...." 33 U.S.C. § 1365(a); *see also Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir.2001) (to commence enforcement, a citizen-plaintiff must prove that the defendant discharged a pollutant into navigable waters from a point source and the discharge was not authorized by one of several specified sections of the Act). The CWA confers subject matter jurisdiction over citizen suits when a citizen-plaintiff makes good faith allegations of continuous or intermittent violations. *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64–65, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The Act does not require that a defendant actually be in violation before a citizen-suit may be filed, only that the citizen-plaintiff makes non-frivolous allegations grounded in fact that the defendant is in violation. *Id.*

Plaintiffs assert that at the time the Complaint was filed, (1) defendants were in violation of the 1999 NPDES permit issued under Section 1342 of the CWA, (2) Pacific Surimi's discharge of wastewater without an NPDES permit is a violation of the Act, and (3) Pacific Surimi's violations of the 1999 SCO are violations of a state order. The court finds that these allegations were made in good faith and are

violation for discharging without an NPDES permit.

sufficient to give this court jurisdiction to determine whether defendants are liable for the alleged violations.

Defendants next argue that plaintiffs lack standing to bring this litigation because plaintiffs have not suffered an injury-in-fact, cannot trace any alleged harm to defendants' discharges, and their alleged injuries cannot be redressed by a favorable decision. *See generally Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (setting forth this three-part test for constitutional standing).

■ The CWA grants any citizen standing to bring an enforcement action, and defines a "citizen" as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(a). The CWA does not permit citizen suits for "wholly past" violations. *Gwaltney,* 484 U.S. at 64, 108 S.Ct. 376. Rather, to have standing under the Act, the citizen-plaintiff must prove the existence of ongoing violations or the reasonable likelihood that future violations will occur. *Id.* at 67–68, 108 S.Ct. 376.

■ "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth v. Laidlaw Env'tl Servs., Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (*Sierra II*)); *see also Natural Res. Def. Council v. Southwest Marine, Inc.,* 236 F.3d 985 (9th Cir.

2000) (standing derived from curtailed use of bay for recreation due to concern about stormwater discharges); *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141 (9th Cir.2000) (regular or continuous use of an area is unnecessary to confer standing).

■ In addition to alleging an injury-in-fact, a citizen-plaintiff must show a substantial likelihood that the defendant caused his or her injury. This does not mean that the plaintiff must prove to a scientific certainty that the defendant's unlawful discharge alone caused the plaintiff's injury. *See, e.g., Save Our Cmty. v. EPA,* 971 F.2d 1155, 1161(5th Cir.1992); *Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 72 (3d Cir.1990).

The third prong of the jurisdictional test pertains to remedies. The plaintiff must show that his or her injuries are likely to be redressed by a favorable decision.

Plaintiffs Diane Heintz (Heintz) and Rena Taylor (Taylor) are members of plaintiff Oregon State Public Interest Research Group (OSPIRG).[4] They each own property near the facility and near the waterways affected by the facility. They are affected by offensive odors coming from the Skipanon River. Heintz canoed the river until she became concerned about the water's unhealthy quality. Taylor used to walk in the area but is compelled to frequent other recreational areas because of the river's foul conditions. Both Heintz and Taylor have observed reduced recreational activity near the river. Heintz testified that she has found pinkish scum under a bridge downstream from the facility that it emanated unpleasant, fishy odor.

4. OSPIRG is a student-based organization whose core purpose is protecting the environment, particularly by seeking compliance enforcement of the CWA. Declaration of Maureen Kirk, ¶¶ 2, 3.

Michael Brown, Coast's plant general manager, testified that a portion of the facility's wastewater discharge is visible on the surface of the water and that this surface accumulation moves from the facility out into the river. Deposition of Michael Brown, 89:9–90:6, Second Caldart Decl., Ex. 10 (Caldart Decl. *II*).

The court finds that plaintiffs meet the three-part test for standing. First, they have shown that they have an interest in preserving the aesthetic integrity of the Skipanon River and that their enjoyment of the river is affected by their concern for the water quality and the health of the fish and wildlife that live there. Second, plaintiffs have shown that their injury is traceable to defendants' wastewater discharge. Finally, this court is able to fashion relief so as to redress plaintiffs' injuries by ordering an injunction or other civil penalty to encourage defendants to comply with the Act.

Moreover, the court finds that OSPIRG has representative standing to bring this suit. An organization has standing to sue in a representative capacity if its members have standing in their own right. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 65–66, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (recognizing that an organization has representative standing when it seeks to protect interests that are germane to the organization's purpose and neither the claim asserted nor the relief requested requires the individual members of the organization to participate in the litigation).

Here, plaintiffs have individual standing. Second, one of the primary focuses of OSPIRG is clean water issues. Third, the participation of the individual members of OSPIRG is not required in this litigation because plaintiffs seek an injunction and civil penalties, not individual damages.

## 2. Defendants' Violations

The CWA imposes strict civil liability on violators of its provisions. *See, e.g., Kelly v. EPA,* 203 F.3d 519, 523 (7th Cir.2000); *U.S. v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir.1979); *California Pub. Interest Research Group v. Shell Oil Co.,* 840 F.Supp. 712, 714 (N.D.Cal.1993). The defendant's good faith or reference to data reporting errors is irrelevant to establishing civil liability. *Id.* (citations omitted).

To establish liability at the summary judgment stage, a citizen-plaintiff must offer proof that the alleged violations were ongoing at the time the complaint was filed. This may be shown "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co. of Calif.,* 853 F.2d 667, 671 (9th Cir.1988) (citation omitted) (*Sierra III*). Because of the various assurances of reliability inherent in DMRs, courts have readily accepted such records as evidence of liability. 40 C.F.R. § 122.41(1)(4)(I); *Sierra Club v. Union Oil Co. of Calif.,* 813 F.2d 1480, 1491–92 (*Sierra I*), *vacated and remanded on other grounds,* 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988) (DMRs must contain a complete and accurate record of pollutant monitoring by the permit holders); 33 U.S.C. § 1319(c)(2) (such accuracy is further encouraged by the availability of criminal penalties for false statements). DMRs are also judicial

admissions and the defendant may not impeach its own reports by showing sampling error. *See id.*

### a. Pacific Coast

The parties agree that Coast has committed violations of the 1999 permit. The correct number of violations is disputed, however. Plaintiffs assert that Coast should be liable for a total of 808 days of violation of the 1999 permit (202 days of violation of the oil and grease limits, plus 417 days of violation of the TSS limits for bottom fish, plus 189 days of violation of TSS limits for shrimp). Coast contends that they are liable for only forty-nine violations. The disparity in these numbers arises primarily from the parties' differing versions of how to calculate violations—by months or by days—and because the DEQ apparently penalized Coast for a portion of the violations only.

The Act imposes a maximum penalty "per day for each violation." 33 U.S.C. § 1319(d). This phrase has been interpreted as meaning that the daily maximum penalty applies separately to *each* violation of an express limitation. *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs,* 261 F.3d 810, 817 (9th Cir.2001) (emphasis in original); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1137–38 (11th Cir.1990); *EPA v. City of Green Forest, Ark.,* 921 F.2d 1394, 1407 (8th Cir.1990) (violation of monthly average effluent limitation should be counted as thirty separate violations); *Powell Duffryn,* 913 F.2d at 78–79 (it is not double counting to find that a single reported exceedance violated both the seven-day discharge limit and the thirty-day discharge limit for that pollutant); *United States v. Amoco Oil Co.,* 580 F.Supp. 1042, 1045 (W.D.Mo.1984) ("[W]here effluent limitations are set on a 'monthly average' basis, a 'violation' of that limit would be a violation covering and including all of the 30 days of that monthly period. . . .").

Defendants argue that the DEQ has historically assessed a violation of the monthly average limit in an NPDES permit or in an agreed order as one violation for the entire month, rather than as a separate violation for every day of that month, and that this court should defer to this method of calculating. However, a state agency's assessment or interpretation of a federal statute is not entitled to deference when it conflicts with a federal agency's interpretation. *Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491, 1495 (9th Cir.1997) (citing *Chevron USA, Inc. v. Natural Res. Def Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)) (federal agencies are uniquely familiar with the subject matter of their mandates and are better equipped than state agencies to interpret federal laws).

Defendants' description of how the DEQ interprets and calculates violations of the CWA is contrary to the method described by the EPA, the federal agency charged by Congress with administering the CWA. As noted, this court must interpret the CWA in accordance with federal law. Consequently, this court finds that it must construe a violation of a monthly average discharge limit as a violation for each day during that month that discharge occurred, regardless of how the DEQ might calculate the violations. *See* 33 U.S.C. § 1319(d) (authorizing assessment of penalties "per day for each violation"); *see also* O.R.S. § 468.140(1)-(2) ("any person who violations [the terms or conditions of an NPDES permit] shall incur a civil penalty for each day of viola-

tion" and that each day of violation is a separate violation).

According to the relevant daily production reports and DMRs, Coast has committed 202 days of violation of the oil and grease limits and 417 days of violation of the TSS limits for bottom fish. Caldart Decl. *I*, Ex. 13; Caldart Decl. *II*, Ex. 5, 6.[5] However, as explained further below, the court finds that plaintiffs have failed to show that Coast's shrimp violations were ongoing. The court reduces the number of violations accordingly.

■ To determine whether violations can be derived from the DMRs, the first step is to determine which species is being reported. Caldart Decl. *I*, Ex. 7. Next, the relevant effluent values (reported as "lbs./1000 lbs.") are compared to the daily maximum limits for TSS and oil and grease. If there is only one sample for a particular species in a month, the value for that sample is also the reported monthly average. If there is more than one sample for a particular species in a month, the values are averaged to calculate the reported monthly average. *See id.*

Coast argues that plaintiffs have failed to show that the shrimp violations were ongoing at the time the Complaint was filed. This court agrees. As explained above, a plaintiff proves a *prima facie* case of ongoing violations of the CWA by producing evidence from which a reasonable trier of fact could find that, as of the date the complaint was filed, there is a likelihood that the defendant will continue to commit intermittent or sporadic violations. *Sierra III*, 853 F.2d at 671.

Plaintiffs have adduced evidence that: (1) Coast violated its TSS limits for shrimp every season it processed shrimp from 1999 to 2002; (2) the last shrimp sample was taken in June 2002, prior to the filing of the Complaint in July 2002; (3) the May, June, and July 2002 TSS discharges exceeded the permit limitations; and (4) Coast took no steps between the date of the last shrimp sample (June 13, 2002) and the date the Complaint was filed (July 11, 2002) to improve the quality of its wastewater discharge. However, defendants have produced a shrimp wastewater sample from July 2002, the same month that the Complaint was filed, that is below the permit limit. Viewing the evidence in a light favorable to defendants, the court finds that this is sufficient to create a triable issue regarding whether Coast committed ongoing shrimp violations at the time the Complaint was filed. Therefore, plaintiffs' motion is denied insofar as it seeks a declaration that Coast is liable for the alleged shrimp violations.

**b. Pacific Surimi**

The parties agree that Pacific Surimi has been discharging wastewater without an NPDES permit since 1999 and is liable for 332 days of violation. However, defendants argue that the 1999 SCO shields them from liability.

■ The 1999 SCO is not the legal equivalent of an NPDES permit and does not insulate Pacific Surimi from liability under the Act for discharging without a permit. The Act provides that "[e]xcept

---

**5.** Plaintiffs reserve for trial or a later motion several violations they originally claimed in their motion, including alleged crab and salmon violations, because it is unclear from certain production reports and DMRs the exact nature of the wastestream Coast sampled, and because defendants have raised factual issues as to whether Coast sampled mixed wastestreams (bottom fish and crab, or bottom fish and salmon) from different production lines during the months the violations occurred.

as in compliance with this section ... the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The key requirement of the Act is to obtain and comply with a permit under the NPDES program pursuant to 33 U.S.C. § 1342. Discharges without a permit are subject to citizen suits. 33 U.S.C. §§ 1319, 1365.[6]

The Oregon counterpart to Section 1311(a) of the CWA provides that no person shall "[d]ischarge any wastes into the waters of the state from any industrial or commercial establishment" without first obtaining a permit from the DEQ. O.R.S. 468B.050(1).

Nothing in the federal or state statutes provides that a state-issued SCO is the equivalent of an NPDES permit, or that it can be construed as a shield from liability. This court declines to so conclude.

Moreover, there is evidence that the DEQ did not consider the SCO to be the equivalent of an NPDES permit. As noted above, although the DEQ issued the SCO "in lieu of" a permit, it stated that Pacific Surimi still is required to obtain "an individual NPDES permit in order to discharge." The 1999 SCO was intended as an interim enforcement order "while the permits [were] being drafted." Moreover, state enforcement orders that are not issued in accordance with the procedures needed for the issuance or modification of an NPDES permit do not have the same legal effect as an NPDES permit. *See, e.g., Citizens for a Better Env't–Calif. v. Union Oil Co. of Cal.,* 83 F.3d 1111, 1119–20 (9th Cir.1996). Accordingly, Pacific Surimi is liable for the 332 days it discharged without an NPDES permit.

The parties agree that Pacific Surimi has committed ongoing violations of the 1999 SCO's numeric limits. Plaintiffs assert Pacific Surimi is liable for 433 days of violation (275 days of violation of BOD limits and 158 days of violation of the oil and grease limits). Pacific Surimi contends that it has committed only thirty-two violations.

Pacific Surimi's calculations are based upon the same violations relied upon by plaintiffs. However, Pacific Surimi's calculations rely upon the erroneous method of calculating addressed above. For the reasons provided previously in this opinion, accordingly, Pacific Surimi is liable for 433 days of violations.

## CONCLUSION

Plaintiffs' Motion for Partial Summary Judgment (Doc. # 56) is GRANTED in part and DENIED in part. Pacific Coast is liable for 619 days of violation of certain discharge limits in its NPDES permit since 1999. Pacific Surimi is liable for 332 days of violation, which includes the days for which it operated without an NPDES permit. Pacific Surimi is also liable for 433 days of violation of certain discharge limits in the SCO.

The parties are ordered to submit a Joint Status Report to the court no later than April 22, 2005, addressing the issues that remain for trial and proposing a trial management order.

IT IS SO ORDERED.

---

6. There are enumerated statutory and regulatory exceptions to the NPDES permit requirement, none of which is applicable here. *See* 40 C.F.R. § 122.3; 42 U.S.C. § 9601 *et seq.*