In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-2969 & 12-3434

WISCONSIN RESOURCES PROTECTION
COUNCIL, ET AL.,

*Plaintiff-Appellees, Cross-Appellants*,

*v.*

FLAMBEAU MINING COMPANY,

*Defendant-Appellant, Cross-Appellee.*

Appeals from the United States District Court for the
Western District of Wisconsin.
No. 3:11-cv-00045-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED APRIL 23, 2013 — DECIDED AUGUST 15, 2013

Before RIPPLE and HAMILTON, *Circuit Judges*, and
STADTMUELLER, *District Judge.*[*]

RIPPLE, *Circuit Judge.* The Wisconsin Resources Protection
Council, the Center for Biological Diversity and Laura Gauger
(collectively the "plaintiffs") brought this action under the

---

[*]   The Honorable J. P. Stadtmueller, of the United States District Court for
the Eastern District of Wisconsin, sitting by designation.

Clean Water Act's ("CWA" or "the Act") citizen-suit provision, 33 U.S.C. § 1365(a)(1), alleging that Flambeau Mining Company ("Flambeau") violated the CWA by discharging pollutants without a permit. The district court denied Flambeau's motion for summary judgment, holding that Flambeau was not protected by the CWA's permit shield provision, *id.* § 1342(k). After a bench trial, the district court determined that Flambeau had violated the CWA and assessed penalties against Flambeau. Because the CWA's permit shield applies, we reverse the judgment of the district court.

## I

## BACKGROUND

### A. Relevant Statutory and Regulatory Framework

Congress enacted the CWA, 33 U.S.C. § 1251 et seq., in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). To achieve this purpose, the CWA generally prohibits "the discharge of any pollutant by any person" into navigable waters of the United States. *Id.* § 1311(a). However, such a discharge is permitted when done pursuant to a national pollution discharge elimination system ("NPDES") permit. *See id.* §§ 1311(a), 1342. NPDES permits are issued pursuant to section 402 of the CWA, codified at 33 U.S.C. § 1342(a), which authorizes the Act's administrator to "issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a)."

The Environmental Protection Agency ("EPA") is the CWA's administrator. However, because the CWA also

embodies Congress's intent "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b), it empowers the EPA to delegate its permitting and enforcement authority to individual states, *id.* § 1342(b). A state seeking to administer the CWA must submit for EPA approval "a full and complete description of the program it proposes to establish and administer under State law." *Id.* § 1342(b).[1] Once the EPA has approved a state's program, the EPA no longer has authority to issue NPDES permits under the CWA, *id.* § 1342(c); at that point the state permitting authority is the only entity authorized to issue NPDES permits within the state's jurisdiction. However, the EPA retains supervisory authority over the state program and is charged with "notify[ing] the State of any revisions or modifications [to the State's program] necessary to conform to [CWA] requirements or guidelines." *Id.* § 1342(c)(1).

It is undisputed that Wisconsin has obtained approval from the EPA to implement and administer its own NPDES permitting program, which it calls the Wisconsin Pollutant Discharge Elimination System ("WPDES") program.[2] The Wisconsin Department of Natural Resources ("WDNR") administers the WPDES program and Wisconsin Administrative Code NR

---

[1]  The requisite steps for obtaining EPA approval are set forth in 40 C.F.R. § 123.21(a).

[2]  Appellee's Br. 17 ("Wisconsin has obtained this EPA approval. . . ."); *see also generally Andersen v. Dep't of Natural Res.*, 796 N.W.2d 1, 10-11 (Wis. 2011).

§ 283 governs the WPDES program.[3] Thus, within Wisconsin, the WDNR, not the EPA, issues NPDES permits.

After obtaining initial approval of a state NPDES program, a state with delegated authority can modify its program with EPA approval. When a state wishes to do so, the regulations direct it to "submit a modified program description" to the EPA for approval. 40 C.F.R. § 123.62(b)(1). The EPA "will approve or disapprove program revisions based on the requirements … of the CWA." *Id.* § 123.62(b)(3). "A program revision shall become effective upon the approval of the Administrator. Notice of approval of any substantial revision shall be published in the FEDERAL REGISTER.[4] Notice of approval of non-substantial program revisions may be given by a letter from the Administrator to the State Governor or his designee." *Id.* § 123.62(b)(4).

In 1987, Congress amended the CWA to include regulation of storm water discharge. *See* The Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7 (1987) (codified at 33 U.S.C. § 1342(p)). To comply with these amendments, Wisconsin proposed modifying Wisconsin Administrative Code NR § 216 to provide WPDES storm water discharge permits. Under Wisconsin's proposed revisions, storm water would be regulated either by a separate WPDES permit or, under NR

---

[3]  *See, e.g., Andersen*, 796 N.W.2d at 12 ("Wisconsin Stat. ch. 283 also codifies the WPDES permit program.").

[4]  40 C.F.R. § 123.62(b)(2) provides that "[w]henever EPA determines that the proposed program revision is substantial, EPA shall" take various steps, including providing for public notice and comment.

§ 216.21(3) (now renumbered NR § 216.21(4)(a)),[5] a different permit. The current version of NR § 216.21(4) provides:

> (4) OTHER ENVIRONMENTAL PROGRAMS. If one of the following conditions is met, the department may determine that a facility is in compliance with permit coverage required under s. 283.33, Stats. [part of the WPDES program], and will not be required to hold a separate permit under s. 283.33, Stats.:

> (a) The storm water discharge is in compliance with a department permit or approval, which includes storm water control requirements that are at least as stringent as those required under this subchapter.

Wis. Admin. Code NR § 216.21(4)(a) (2013).

Wisconsin submitted its proposed modifications, including NR § 216.21(4)(a), to the EPA for approval in 1994. The EPA apparently did not deem these modifications substantial and so did not follow the approval process outlined in 40 C.F.R. § 123.62(b)(2). Instead, the EPA sent the WDNR comments on the proposed changes, although it appears never to have issued a formal letter of approval. Among its comments to NR § 216.21, the EPA wrote: "We concur with the approach whereby facilities which are required under regulation to obtain permits, but which … are currently controlled under other regulatory mechanisms, are handled in special ways

---

[5]  For clarity, we will refer to this section by its current numbering.

under the State's permit program."[6] After receiving and responding to the EPA's comments, Wisconsin enacted NR § 216.21(4)(a).

**B. Flambeau's Operations**

From 1993 until 1997, Flambeau operated an active mine in Ladysmith, Wisconsin, along the Flambeau River. During this time, WDNR regulated Flambeau under a separate WPDES permit and a mining permit, which also imposed restrictions on Flambeau's storm water discharge. Flambeau had a reclamation plan in place to restore the mine site after the cessation of active mining. However, the City of Ladysmith and the Ladysmith Community Industrial Development Corporation asked Flambeau to preserve the mine site's current buildings, which was not called for under the original reclamation plan. Flambeau agreed and sought modification from the WDNR of its reclamation plan and mining permit. After public notice and comment, the WDNR approved Flambeau's new reclamation plan and modified its mining permit.

In conjunction with its review of Flambeau's proposed modifications, the WDNR evaluated potential storm water discharge from the mine site. Eventually, the WDNR decided to terminate Flambeau's separate WPDES permit and instead, pursuant to its authority under NR § 216.21(4)(a), regulate Flambeau's storm water discharge under its mining permit. This approach permitted the WDNR to conduct more frequent inspections of the mine site than would a separate WPDES

---

[6] R.62-1 at 132.

permit. Moreover, the WDNR determined that this approach was permitted under NR § 216.21(4)(a) because the WDNR "had basically [determined there to be] a functional equivalence from the mining permit to the storm water permit at the time; that [WDNR] could have equal protection, if not greater protection, under the mining permit."[7] On March 20, 1998, the WDNR sent Flambeau a letter "to clarify how the department intends to regulate surface water management at the [mine] site," including storm water discharge.[8] The letter stated:

> The current water handling procedures are acceptable to the department and are consistent with the Mining Permit, including the Surface Water Management Plan, and the Wisconsin Pollutant Discharge Elimination System (WPDES) Permit. It is our intent that the WPDES permit will continue to regulate discharges from the site through outfalls 001 and 002 as long as water is being pumped from one location to another on the site. Any discharge through those outfalls must comply with the effluent limits and monitoring requirements specified in the WPDES permit[] … as long as the WPDES permit remains in force. Once all permanent water management structures and facilities are in place and pumping is no longer necessary, discharges through outfall 002 will cease to be covered under the WPDES permit. At that time, stormwater man-

[7]  R.274 at 81 (testimony of WDNR's head of metallic mining).

[8]  R.62-2 at 2.

agement will fall under the regulatory authority of
the Mining Permit and its associated plans.[9]

The WDNR reiterated its decision to regulate Flambeau's
storm water discharge under the mining permit rather than a
separate WPDES permit again on September 8, 1998. The
WDNR wrote to Flambeau "to acknowledge that surface water
management and related discharges … . at the Flambeau
mining site are no longer subject to the provisions of the
Wisconsin Pollutant Discharge Elimination System (WPDES)
Permit. This is consistent with the regulatory approach
outlined in [the WDNR's] letter to [Flambeau] dated March 29,
1998."[10] On September 23, 1998, the WDNR terminated Flam-
beau's WPDES permit.[11] All of Flambeau's subsequent storm
water discharges complied with the mining permit.

## C. District Court Proceedings

Plaintiffs brought this action in the district court under the
citizen-suit provision of the CWA, 33 U.S.C. § 1365, which
alleged that Flambeau discharged copper into navigable waters
without a permit. The parties filed multiple pre-trial motions,
including Flambeau's motion for summary judgment, alleging
that the plaintiffs' suit was barred by the CWA's permit shield
provision, *id.* Section 1342(k) of Title 33 provides that
"[c]ompliance with a permit issued pursuant to this section
shall be deemed compliance[]" with the CWA. The plaintiffs

---

[9]  *Id.*

[10]  R.66-8 at 2.

[11]  R.66-9 at 2.

contended that the permit shield did not apply because Flambeau did not have a WPDES permit during the relevant time period and its mining permit did not trigger the permit shield because it was not issued pursuant to the CWA. The plaintiffs' argument was based on the claim that NR § 216.21(4)(a) was not part of the WDNR's CWA program because Flambeau could not establish that the EPA specifically had approved of NR § 216.21(4)(a). The district court agreed and denied Flambeau's motion, ruling that § 1342(k)'s permit shield did not apply because Flambeau did "not show[] that the EPA has approved use of state mining permits via § NR 216.21(4) as substitute for [a WPDES] permit."[12]

A bench trial was held, after which the district court found that Flambeau had violated the CWA because copper was discharged eleven times from the mine site and reached navigable waters of the United States without a permit. The court emphasized that "[t]he amounts were so modest that I would declare them de minimis"[13] and that Flambeau's "efforts to protect the environment during its mining operations and reclamation effort" were "exemplary" and "deserve commendation, not penalties."[14] However, because the CWA is a strict liability statute, *see Kelly v. United States EPA*, 203 F.3d 519, 522 (7th Cir. 2000), the district court found Flambeau liable and

---

[12]    *Wis. Res. Prot. Council v. Flambeau Mining Co.*, 903 F. Supp. 2d 690, 720 (W.D. Wis. 2012).

[13]    R.256 at 3.

[14]    *Id.* at 4.

imposed a penalty of $25.00 for each of the eleven discharges.[15] The court also *sua sponte* declined to award plaintiffs attorneys' fees under the CWA. It stated that fees were inappropriate under the "unusual circumstances of th[e] case," where "it remains unclear … why [plaintiffs] would have expended so much time and energy litigating against a company that seems every bit as committed as they are to the protection of the environment and preservation of water quality."[16] Plaintiffs moved for reconsideration of the denial of attorneys' fees, which was denied. Flambeau timely appealed and plaintiffs cross-appealed on the issue of their entitlement to fees.

## II

## DISCUSSION

Flambeau raises a variety of issues on appeal. It asserts that the district court erred at summary judgment when it determined that the CWA's permit shield did not apply and that Wisconsin is not a necessary party whose joinder is required. Flambeau next submits that the district court's determination that Flambeau violated the CWA eleven times is erroneous because the court failed to perform the correct analysis and erroneously determined certain waterways to be within the CWA's jurisdiction. We begin with the permit shield.

## A.

The CWA makes "unlawful" "the discharge of any pollutant by any person" "[e]xcept as in compliance with" certain

---

[15]  *Id.* at 39.

[16]  *Id.* at 38.

statutory provisions. 33 U.S.C. § 1311(a). One such provision is the NPDES permit, which "sets out the allowable departures from the CWA's baseline of total liability for discharges." *Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 266 (4th Cir. 2001). The CWA's permit shield provision, 33 U.S.C. § 1342(k), specifies that "if a [NPDES] permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will 'shield' its holder from CWA liability." *Piney Run Pres. Ass'n*, 268 F.3d at 266; *see also* 33 U.S.C. § 1342(k) (providing that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance[]" for purposes of the federal compliance provision and the citizen suit provision); *Coon v. Willet Dairy, LP*, 536 F.3d 171, 173 (2d Cir. 2008) (noting that, under the permit shield, "compliance with an authorized permit is deemed compliance with the CWA, so as long as [the defendant] was acting in accordance with its permit it could not be liable in a citizen suit for CWA violations"). The Supreme Court has explained that the permit shield's purpose is "to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, [the permit shield] serves the purpose of giving permits finality." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977).

Plaintiffs contend that Flambeau is not entitled to the permit shield because Flambeau does not hold a WPDES permit and its mining permit was not issued pursuant to the CWA. Plaintiffs allege that Wisconsin's NR § 216.21(4)(a), although codified in Wisconsin's Administrative Code as part of the state's WPDES program, is not part of Wisconsin's approved NPDES program because the EPA never approved

NR § 216.21(4)(a). Flambeau responds that the EPA did in fact approve Wisconsin's scheme and, in the alternative, even if it did not, Flambeau had no notice that it needed a different permit nor could it obtain one. In support of its position that the EPA approved NR § 216.21(4)(a), Flambeau points to the EPA's comments on the proposed regulations, which indicate that the EPA reviewed NR § 216.21(4)(a) and in which the EPA stated that it "concur[red] with the approach whereby facilities which are required under regulation to obtain permits, but which … are currently controlled under other regulatory mechanisms, are handled in special ways under the State's permit program."[17] The district court refused to apply the permit shield, holding that for the shield to apply, a valid permit is required. The court determined that Flambeau "has not shown that the EPA has approved use of state mining permits via § NR 216.21(4) as [a] substitute for [WPDES] permit"[18] and so had not established that it possessed a qualifying permit for purposes of the CWA.

## B.

Whether the CWA's permit shield applies to Flambeau is a question of law, which we review de novo. *See Elusta v. City of Chicago*, 696 F.3d 690, 693 (7th Cir. 2012). We begin by noting that there is evidence that the EPA approved NR

---

[17]  R.62-1 at 132.

[18]  *Wis. Res. Prot. Council*, 903 F. Supp. 2d at 720.

§ 216.21(4)(a).[19] However, we need not decide whether the EPA approved this specific provision of Wisconsin's WPDES scheme[20] because, even if Flambeau's permit were legally invalid, we cannot, consistent with the requirements of due process, impose a penalty on Flambeau for complying with what Wisconsin deemed a valid WPDES permit.[21]

Informed by basic principles of due process, it is "a cardinal rule of administrative law" that a regulated party must be given "fair warning" of what conduct is prohibited or required

---

[19]   *See* R.62-1 at 132-33 (comments from the EPA concerning Wisconsin's modifications of its WPDES program in response to CWA amendments); *see generally* Brief of the State of Wisconsin as Amicus Curiae Supporting Appellant. The regulations do not provide a definitive or exclusive form of agency approval for a state's NPDES program modification. The only guidance provided is that "[n]otice of approval of non-substantial program revisions [which the EPA's actions suggest Wisconsin's were] *may* be given by a letter from the Administrator to the State Governor or his designee." 40 C.F.R. § 123.62(b)(4) (emphasis added).

[20]   The district court found that Flambeau made eleven unpermitted discharges into the navigable waters of the United States. It also found that "plaintiffs have not shown that any such discharges are occurring under defendant's new system of infiltration basins, installed in 2011 and afterwards," and so refused to issue plaintiffs' requested injunction. R.256 at 35-37. This finding has not been challenged on appeal. Therefore, because only past, not continuing, violations of the CWA are before us, we need not consider whether Flambeau's mining permit is a WPDES permit or determine whether the EPA approved NR § 216.41(4)(a).

[21]   We note that in its briefing at summary judgment to the district court and to this court on appeal, Flambeau did not use the phrase "due process." However, its arguments concerning notice and fundamental fairness clearly raise the issue of due process.

of it. *Rollins Envtl. Servs. (NJ), Inc. v. United States EPA*, 937 F.2d 649, 655 (D.C. Cir. 1991) (Edwards, J., dissenting in part and concurring in part) (internal quotation marks omitted); *see also United States v. Cinergy Corp.*, 623 F.3d 455, 458-59 (7th Cir. 2010) (holding that defendant could not be sanctioned and found to have violated the Clean Air Act when it complied with regulations as codified, despite having knowledge that the EPA requested amendment of the regulations to prohibit defendant's conduct); *United States v. Trident Seafoods Corp.*, 60 F.3d 556, 559 (9th Cir. 1995) ("[T]he responsibility to promulgate clear and unambiguous standards is on the [agency]. The test is not what [the agency] might possibly have intended, but what [was] said. If the language is faulty, the [agency] had the means and obligation to amend." (first alteration added, other alterations in original) (internal quotation marks omitted)).

The United States Court of Appeals for the District of Columbia Circuit has explained:

> In the absence of notice–for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability. Of course, it is in the context of criminal liability that this "no punishment without notice" rule is most commonly applied. But as long ago as 1968, we recognized this "fair notice" requirement in the civil administrative context. In *Radio Athens, Inc. v. FCC*, we held that when sanctions are drastic—in that case, the FCC dismissed the petitioner's application for a radio station license—"elementary fairness compels clarity" in the

statements and regulations setting forth the actions with which the agency expects the public to comply. 401 F.2d 398, 404 (D.C. Cir. 1968). This requirement has now been thoroughly "incorporated into administrative law." *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987); *see also Rollins*, 937 F.2d at 654 n.1, 655 (Edwards, J., dissenting in part and concurring in part) (principle is not constitutional, but "basic hornbook law in the administrative context," and "simple principle of administrative law").

*Gen. Elec. Co. v. United States EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) (citations omitted) .

In determining whether a party received fair notice, courts frequently look to the regulations and other agency guidance. "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner … ." *Howmet Corp. v. EPA*, 614 F.3d 544, 553-54 (D.C. Cir. 2010) (internal quotation marks omitted). In *United States v. Cinergy Corp.*, we held that the defendant did not have fair notice of an EPA prohibition under the Clean Air Act where it "complie[d] with a State Implementation Plan that the EPA ha[d] approved," even though the defendant knew that the EPA intended for the state to amend its plan. 623 F.3d at 458. Agency guidance provided privately to a regulated entity other than the defendant also is insufficient because it does not permit the defendant to determine "with ascertainable certainty" what is

required of him. *See, e.g.*, *Rollins*, 937 F.2d at 655 (Edwards, J., dissenting in part and concurring in part) (internal quotation marks omitted); *see also id.* at 653-54 (finding inadequate notice where the EPA's regulatory interpretation was provided only in a letter to a private attorney, where "th[e] letter was never sent to [the defendant] or its attorneys and it was never made public").

Here, Flambeau did not have notice that its permit might not be a valid WPDES permit or that it needed a permit other than the one the WDNR determined was required. First, it is undisputed that Wisconsin, through the WDNR, is the proper, and only, CWA administrator with authority to issue NPDES/WPDES permits for Flambeau's mine site. As Flambeau transitioned from active mining to reclamation, the WDNR determined that Flambeau did not require a separate, specifically termed "WPDES" permit apart from its mining permit and sua sponte terminated the separate permit. Thus, the only available guidance from the only CWA permit-issuer was that the mining permit was a WPDES permit. This is the same position the WDNR still maintains—that Flambeau's mining permit is a WPDES permit. We do not require a regulated party to establish that the regulating agency had actual authority to issue a facially proper, and therefore presumptively valid, regulation before complying with the agency's command.

In this case, however, even if Flambeau consulted Wisconsin's Administrative Code, in which the WPDES program is codified, a reasonable, diligent search would have found statutory authorization under the WPDES program for the WDNR to regulate Flambeau in the manner it did and for the

WDNR to deem the mining permit a WPDES permit. As plaintiffs' briefing has demonstrated, to discover that there is even a *potential* issue concerning the validity of NR § 216.21(4)(a) as part of the WPDES program, a party must conduct legislative and regulatory history research, as well as submit document requests to the WDNR. Private parties are entitled to rely on "duly-enacted, and therefore presumptively legitimate, statute[s]" and regulations, so long as such reliance is not unreasonable, such as when the citizen has actual notice that the statute was not properly enacted or that the provision plainly is unconstitutional. *Cohn v. G.D. Searle & Co.*, 784 F.2d 460, 464 (3d Cir. 1986); *see also id.* ("We cannot say that [defendant's] reliance is unreasonable where the statute's constitutionality has never been judicially questioned and where the reach of the constitutional principles involved is as uncertain as here.").

We recently affirmed the principle that a private party is entitled to rely on published regulations. In *Cinergy*, we held that the defendant could not be charged with violating the Clean Air Act when it complied with the published version of a regulation that was part of Indiana's administration of the Clean Air Act. The EPA had secured Indiana's agreement to amend the regulation but Indiana had yet to do so. The EPA sought to impose a penalty on the defendant for violating the future amended version of the regulation. The EPA submitted that there was no due process problem because the defendant "was 'on notice' that [the regulation] did not mean what it said." *Cinergy Corp.*, 623 F.3d at 458. We rejected this argument, holding that the defendant was only on notice of what "a straightforward reading of [the regulation] permitted." *Id.*

Similarly, Flambeau was on notice only of the command of the only relevant CWA permitting authority and the powers conferred on the WDNR by statute. It is this lack of notice that distinguishes Flambeau's case from those relied on by the district court.[22]

Plaintiffs contend that Flambeau was on notice that it lacked a valid WPDES permit. According to plaintiffs, Flambeau had notice because it possessed a separate WPDES permit in the past and language on its mining permit requires the permitee to obtain other permits as required by law.[23] These contentions are unpersuasive. First, Flambeau knew that it needed a WPDES permit but was informed by the WDNR that its mining permit would serve as a WPDES permit, consistent with NR § 216.21(4)(a), and the WDNR sua sponte terminated Flambeau's separate WPDES permit. Plaintiffs maintained at oral argument that Flambeau's proper course of action was to apply for a WPDES permit. However, the WDNR made clear, by its termination of the separate permit and by its consistent position that a separate WPDES permit was unnecessary, that

---

[22] *See, e.g., Citizens for a Better Env't-Cal. v. Union Oil Co.*, 83 F.3d 1111, 1120 (9th Cir. 1996) (refusing to apply the CWA's permit shield where "[i]t is not disputed that these regulations [governing modifications of NPDES programs] were not followed" and so the defendant's permit clearly was insufficient); *Oregon State Pub. Interest Research Grp., Inc. v. Pac. Coast Seafoods Co.*, 361 F. Supp. 2d 1232, 1243 (D. Or. 2005) (holding that a state permit did not trigger the CWA's permit shield where "[n]othing in the federal or state statutes provides that a state-issued SCO is the equivalent of an NPDES permit[]").

[23] *See* Appellees' Br. 23.

it would not issue a separate permit. "The law does not require the doing of a futile act," *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004), and so we shall not penalize Flambeau for failing to apply for a separate WPDES permit after the WDNR terminated its prior one.

Second, the mining permit language directing the permit holder to obtain all other permits required by law does not answer the question. For NR § 216.21(4)(a) provides that the WDNR can determine that a separate WPDES permit is unnecessary. Moreover, neither of these facts—Flambeau's prior possession of a separate WPDES permit or the language of its mining permit—put Flambeau on notice of the risk that NR § 216.21(4)(a) was not actually approved by the EPA and so was beyond the WDNR's CWA authority. Rather, plaintiffs have established only that Flambeau knew that it no longer held a separate WPDES permit.

At bottom, plaintiffs are attempting to attack collaterally the validity of Wisconsin's WPDES program by requiring Flambeau to prove that the specific provision of the program under which the WDNR granted its putative WPDES permit, NR § 216.21(4)(a), is valid. There are two problems with this approach.

First, forcing a permit holder to establish that the undisputed permitting entity had actual authority to issue the permit, despite a facially valid law authorizing the entity to issue the permit, would vitiate the permit shield. Permit holders would be brought into court to establish not only the validity of their permits, but also the validity of the issuing

entity's asserted authority to issue such a permit, requiring permit holders to prove the validity of legislative and regulatory transactions to which they were not parties. This undermines the purpose of the shield provision, which the Supreme Court has stated is to "giv[e] permits finality," *E.I. du Pont de Nemours*, 430 U.S. at 138 n.28.

Second, plaintiffs' approach constitutes a collateral attack on Wisconsin's WPDES program, specifically NR § 216.21(4)(a). Plaintiffs claim to challenge only Flambeau's conduct; however, integral to this challenge is plaintiffs' assertion that Flambeau lacks a WPDES permit and that NR § 216.21(4)(a) is not, contrary to Wisconsin's view and the section's plain language, part of the WPDES program. Plaintiffs fault Flambeau for doing what its CWA administrator and Wisconsin law authorize it to do. This is impermissible. *See Kelley v. Bd. of Trs., Univ. of Illinois*, 35 F.3d 265, 272 (7th Cir. 1994) (holding that "insofar as the University actions were taken in an attempt to comply with the requirements of Title IX, plaintiffs' attack on those actions is merely a collateral attack on the statute and regulations and is therefore impermissible"); *Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 922 F.2d 419, 424 (7th Cir. 1991) ("Insofar as the state is merely doing what the statute and regulations envisage and permit, the attack on the state is an impermissible collateral attack on the statute and regulations. We add that the federal regulations explicitly permit the state or other entity [to engage in the conduct plaintiffs challenged].").

In sum, Flambeau was told by the WDNR that its mining permit constituted a valid WPDES permit. The WDNR's authority to regulate Flambeau under its CWA authority was

confirmed by NR § 216.21(4)(a), and Flambeau had no notice that NR § 216.21(4)(a) was potentially invalid as an exercise of that delegated authority. Under these circumstances, where the permitting authority issues a facially valid NPDES permit and the permit holder lacks notice of the permit's (potential) invalidity, we hold that the permit shield applies. To hold otherwise would be inconsistent with the requirements of due process. Plaintiffs have not alleged or demonstrated that Flambeau failed to comply with its mining permit. Because the permit shield applies, Flambeau is deemed to be in compliance with the CWA, and summary judgment should have been granted for Flambeau. Therefore, we do not reach Flambeau's other arguments on appeal.

## C.

Furthermore, we deny plaintiffs' cross-appeal. In order to be entitled to attorneys' fees under the CWA, plaintiffs must be "a[] prevailing or substantially prevailing party." 33 U.S.C. § 1365(d). Here, plaintiffs are not entitled to attorneys' fees because they have failed to establish a violation of the CWA.

## Conclusion

Accordingly, we must reverse the judgment of the district court.

REVERSED